# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LOEFFEL STEEL PRODUCTS, INC.,    )
                                 )
    Plaintiff,            )
                                 )
vs.                              )    **No. 01 C 9389**
                                 )    **Magistrate Judge**
DELTA BRANDS, INC., d/b/a DBI; and    )    **Jeffrey Cole**
SAMUEL F. SAVARIEGO, individually,    )
                                 )
    Defendants.           )
                                 )

## MEMORANDUM OPINION AND ORDER

Given the complexity of modern litigation, an informed assessment of the facts that courts are routinely called upon to consider is difficult, if not impossible, without the application of some scientific, technical, or other specialized knowledge. The most common source of this knowledge is the expert witness. *See* Advisory Committee Note to Rule 702, Federal Rules of Evidence.[1] The demand for expert testimony by litigants has become insatiable. In response, an astounding number of "expert" consultants and professional witnesses in virtually every field of human endeavor have arrived on the scene. Their proliferation, to borrow Justice Cardozo's felicitous phrase, "would make Malthus stand aghast." The Growth of the Law, 4 (1924).

While it may be a bit of an exaggeration to say that in modern trials the expert is as common as the lawyer, Faust Rossi, Modern Evidence and the Expert Witness, in Litigation Manual: A Primer

---

[1] The history of the common law's treatment of experts is told in VII Wigmore, Evidence §1917 (Chadbourn Rev. 1978). *See also* Learned Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv.L.Rev. 40 (1901).

For Trial Lawyers, 254 (2d ed. 1989),[2] the modern face of litigation does feature expert testimony in a significant percentage of trials. *United States v. Brown*, 32 F.3d 236, 239 (7th Cir. 1994). *Accord, In re Aircrash Disaster*, 795 F.2d 1230, 1234 (5th Cir. 1986). Unfortunately, all too often, the "experts" are "'the mere paid advocates or partisans of those who employ and pay them, as much so as the attorneys who conduct the suit. There is hardly anything, not palpably absurd on its face that cannot now be proved by some so-called experts.'" *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 382 (7th Cir. 1986) (Posner, J.).[3]

Thus, there is scarcely a case involving experts in which substantial pretrial challenges to the admissibility of their testimony are not raised. This case is no exception. The defendants ("DBI") have moved to bar the testimony of Loeffel Steel Product's ("Loeffel") retained liability expert, Rudolph Toczyl; Loeffel has filed its own motion to bar the testimony of DBI's damages expert. Each motion claims the other's expert is unqualified, his methodology flawed, and his testimony irrelevant to the task at hand. We deal here only with the challenges to Mr. Toczyl.

# I
# BACKGROUND

This case concerns the claimed non-performance of a Rotary Shear Multi-blanking Line ("the Line"), a large, complex piece of industrial machinery, manufactured by DBI and sold to Loeffel.

---

[2] In a study of trials in the California Superior Court in the late 1980s, experts appeared in 86% of the trials and on average, there were 3.3 experts per trial. *See* J. Strong, McCormick on Evidence, §13 (5th ed. 1999).

[3] *See also Mid-State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir. 1989) (the expert "cast aside his scholar's mantel and became a shill for Mid-State. Judge Hart, by observing that the emperor has no clothes, protected the interests of the judicial system"); *Karn v. Rand*, 168 F.R.D. 633, 639 (N.D.Ind. 1996); Huber, Galileo's Revenge, Junk Science in the Courtroom, 206-09 (1991); Wright and Gold, Federal Practice and Procedure, §6262 at 183 (1997).

The daunting name describes what the machine does: large rolls or coils of steel are flattened by leveler rollers, cut into prescribed lengths (called "blanks") by rotary shears, and then cut into prescribed widths (called "mults"). The machine's stacker then sorts and stacks the finished product. All of this is done at a rapid rate, measured in hundreds of feet per minute and to exact tolerances, measured in thousandths of an inch. Or at least that is how the machine is supposed to work.[4]

Bitterly disappointed with the machine's performance and its claimed non-compliance with the specifications in the sales contract, Loeffel sued DBI, alleging breach of contract, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, and fraud. In late October 2003, Mr. Toczyl prepared his Rule 26 expert report ("the Report").

## A
## Mr. Toczyl's Report

The seven page, single spaced, highly technical Report was based on Mr. Toczyl's having viewed, over an eight hour period, four actual production runs at the Loeffel plant.[5] In his Report, Mr. Toczyl identified six major areas of concern: (A) length tolerances for finished steel blanks did

---

[4] The sales contract contained a set of detailed specifications, including the feet per minute at which the Line could be run. The speed ranged from 100 to 300 fpm, depending on the length of the cut sheet and whether the machine was engaged in a blanking or multiple-blanking function. (See Exhibit A to Complaint at 7, ¶ 2.03.).

[5] The runs consumed three coils of prime steel and involved customer orders for: (1) multi-blanking of pre-painted, galvanized, .044 gauge prime steel into lengths of 216", with 2 mults each 10" in width; (2) multi-blanking of coated, "hot-dipped" galvanized, .029 gauge prime steel on a 55" wide coil into 3 mults of 17.12" in width, roughly 31" in length; (3) multi-blanking of coated, "hot-dipped" galvanized, .029 gauge prime steel on a 55" wide coil into 6 mults, roughly 48" in length; (4) blanking of .023 gauge steel into lengths of 19.875" with 42 ⅜" of width side-trimmed to 38 3/16".

3

not conform to contract specifications when the Line ran at speeds in excess of 120 fpm; (B) the leveler could not correct defects across the steel thickness range specified in the contract; (C) the tooling exchange could not be completed in the 90 seconds required in the contract; (D) the Line could not process steel without repeated interruptions at speeds significantly slower than those the contract specified; (E) the Line was not capable of executing multi-blanking operations at speeds remotely close to those specified in the contract, and blanks produced were frequently of inferior quality; and (F) the Line caused defects in the surface of the steel it processed.

The Report contained details of Mr. Toczyl's observations. Beginning with the machine's accuracy in cutting steel to desired length and width, Mr. Toczyl noted that the contract provided that the Line was to cut blanks less than or equal to 72" in length, at an accuracy of plus or minus .005," and blanks less than or equal to 144" in length at an accuracy of plus or minus .008". Mr. Toczyl reported that the Line failed to cut any blanks to length accuracies near .005 when the Lines ran at 120 fpm and that, in fact, accuracy was no better than .015 at that speed. He stated that he observed a considerable drop-off in length accuracy when Line speed accelerated past 100 fpm. (Report at 2-3).

Mr. Toczyl also noted that the contract specified that width accuracies would be plus or minus .002". He observed that the Line did not have a "packed arbor" and/or "dedicated" or "ultra-precision tooling" which, in his opinion, precluded width accuracies of better than .010." *Id.* at 3. At his deposition, he testified that he had never seen an "open arbor" – the type on the Line – accomplish the tolerance the contract specified. Indeed, at his deposition, he testified that, on the day of his visit, the operators measuring widths during the production runs generally found the blanks to be 1/16" off. *Id.* at 77-80.

4

According to Mr. Toczyl, during his 8-hour observation of the Line's production runs, the Line failed to approach any of the contract's benchmarks for production speed either during single or multiple blanking runs. During single blanking runs, the Line could not run at speeds in excess of 140 fpm without major mechanical difficulties necessitating the cessation of operations. For example, during the run that required blanking .023 gauge steel into lengths of 19.875" and trimming it from 42 ⅝" in width to 38-3/16", Mr. Toczyl observed a noticeable drop-off in accuracy at 120 fpm. During the run that called for multi-blanking of .044 gauge sheets into lengths of 216", with two "mults" or "blanks" each 10" in width. For instance, Mr. Toczyl reported that the Line's operators began at a speed of 70 fpm and then attempted to increase it to 200 fpm. At that point, the shear began catching on the sheets, halting the run. In conclusion, Mr. Toczyl found the Line could not operate at the speed specified in the contract – 300 fpm – while maintaining length tolerances. (Report at 4-5).

Mr. Toczyl also evaluated the performance of the leveler. He found that the type of roller in the machine could not correct flaws in steel ranging in thickness from .009" through .125".[6] Mr. Toczyl opined that the DBI leveler could not correct defects in the .009 to .023 range because the diameters of its rollers are too large. The result, Mr. Toczyl reported, is that flaws such as "edge waves" and "center buckle" will not be corrected. (Report at 3-4).

Addressing the Line's tooling system, Mr. Toczyl's report related that although the contract provided for a ninety second tooling change time, it took three Loeffel employees, whom he felt were

---

[6] He explained that the leveler is designed to correct defects at 4-5 times its minimum effective thickness capability. For example, a 6 Hi leveler with a 1.750 roll diameter is typically expected to correctively level mild steel as thick as roughly .125 and, dividing that figure by 4 or 5, one can anticipate that the leveler can correct, at best, mild steel of roughly .024 thickness. (Report at 3).

adept with the system, 9 ½ minutes to change the tooling. As Mr. Toczyl described the process:

> these men had to remove a number of bearings and supports before precisely locking in the new tooling system. It took them at least three (3) minutes to unlock the locking apparatus and, of all the different locks, only one (1) locking pin was hydraulically driven.

(Report at 4). Based on his extensive familiarity with the type of equipment involved, Mr. Toczyl opined that the exchange could not be completed in period much shorter than the 9½ minutes he observed. *Id.*

Mr. Toczyl also reported problems with the stacker during single-blanking at speeds of 120 fpm, which required the operators to stop the Line for as long 5 to 10 minutes so that they could adjust the tension and pressure on the stacker, remove any blanks damaged by collision, and realign the stack. Mr. Toczyl also noted that the employees had to scrap a number of unacceptable blanks. (Report at 5).

During multi-blanking, Mr. Toczyl reported that it was even more difficult to maintain a consistent Line speed, and the interruptions were more frequent. He witnessed stacker problems occurring at 140 fpm. Even at 90 fpm, he reported that the stacker failed to drop sheets in a timely manner, forcing the operators to reduce speed to 70 fpm. There were similar problems with the stacker during the other runs as well. (Report at 5-6).

Mr. Toczyl concluded that the Line could not produce multi-blanks accurately or at specified production rates due to an incongruity between the slitter and the stacker. Specifically, he reported that the stacker required "blank separators" which act to segregate incoming blanks so that they do not interweave or cross over when the magnets release them for stacking. Even when the Line was retrofitted with separators, it could stack no more than two or three mults. In addition, he explained

that, because of the space the separators consume, the Line could not handle 72" wide coils as specified. Mr. Toczyl stated that the stacker could not consistently stack more than two blanks during any given run, falling far short of the contract specification of six mults. Based on his observations of regular stacking, and after viewing a videotape of Loeffel employees attempting "alternate" stacking, Mr. Toczyl was convinced the Line could not perform that function as specified either. (Report at 6-7).

Finally, Mr. Toczyl noted that the contract specified that the Line must be able to process galvanized and pre-coated cold rolled steel. He indicated that the leveler rollers did not incorporate the protective elements necessary to perform surface-sensitive jobs on these types of products. Mr. Toczyl found similar problems with the rollers on the stacker. According to Mr. Toczyl, the Line was the first one he had seen in 49 years that was supposed to be designed to process surface-sensitive material but allowed metal-to-metal contact, resulting in scratched blanks. *Id.* at 8.

The Report concluded that the "DBI Line will never meet the production specifications set forth in the contract... because many of the impediments to Loeffel's achievement of speedier production runs (while maintaining blank accuracies) are not correctable." (Report at 8) (parenthesis in original.).

## B
## The Defendants' Motion to Bar Mr. Toczyl's Testimony

DBI's motion, which challenges Mr. Toczyl's competency to testify to anything in his Report, insists that his methodology is "completely unscientific" and constitutes "junk science" and thus will not assist the trier of fact. Although the sales contract between Loeffel and DBI is highly technical, and although an informed assessment of the Line's performance requires specialized and

technical knowledge far beyond that possessed by the ordinary layman, DBI says Mr. Toczyl's testimony should be barred because it was based in part on information obtained from Loeffel's employees, who are characterized as biased bunglers, and because it will merely reprise their testimony.

The latter argument, in addition to being more of a Rule 403 than a 702 argument, is inconsistent with the simultaneously advanced claims about the incredibility and competency of the testifying Loeffel employees. If DBI's assessment is accurate, it would seem that there is a greater rather than a lesser need for Mr. Toczyl's testimony. Also, if Mr. Toczyl testifies first, his testimony will not, by definition, be a "rehash" of the Loeffel employees' testimony. The argument then to be made would be that *their* testimony was "needlessly cumulative." But these are more trial arguments than the stuff of pretrial motions to bar expert testimony.

## II
## THE ANALYTICAL FRAMEWORK FOR DETERMINING ADMISSIBILITY

### A
### The Evaluation of "Reliability"

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that the "general acceptance" test for the admissibility of scientific evidence, which had existed in the federal courts since 1923, was at odds with the liberal thrust of the Federal Rules of Evidence and their general approach of relaxing the traditional barriers to opinion testimony. *Id.* at 588-89, 593. The Court held that the displacement of the "general acceptance" test by the Rules did not mean that the Rules placed no limits on the admissibility of purportedly scientific evidence. Nor was the judge disabled from "screening" such evidence. Quite the contrary. Under the Rules, trial judges

have a responsibility to make a determination under Rule 104, as a precondition to admissibility, that proffered scientific evidence rests on a reliable foundation and is relevant to the task at hand. *Id.* at 589, 597.

The primary locus of this obligation, the Court held, was Rule 702, which at the time provided:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

While discussing several factors which "bear upon the [reliability] inquiry,"[7] the Court emphasized that the inquiry is "a flexible one," and that it was "not presum[ing] to set out a definitive checklist or test." The focus is not on the expert's conclusions, but on the underlying methodology. *Id.* at 593-595. To be admissible, scientific evidence must supported by "appropriate validation." *Id.* at 590.

*Daubert* concluded with a reaffirmation of the adversary system generally and the capability of juries to understand scientific evidence and weigh the credibility of the competing experts, notwithstanding their contradictory conclusions and "dogmatic assertions." *Railroad Commission v. Rowan & Nichols Oil Co.*, 310 U.S. 573, 583 (1946). Vigorous cross examination, presentation of contrary evidence and careful jury instructions, the Court said, are the traditional and appropriate means of attacking shaky but admissible evidence. *Daubert*, 509 U.S. at 596. *Accord Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 (7th Cir.2000); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718-719

---

[7] They were: (1) whether a theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation. Although rejecting "general acceptance" as the exclusive test for admissibility, the Court noted that it could be an additional factor that might bear on reliability. 509 U.S. at 593-94.

(7th Cir. 2000); *Spearman Industries, Inc. v. St. Paul Fire & Marine Insurance Co.*, 128 F.Supp.2d 1148, 1150 (N.D.Ill. 2001) ("The rejection of expert testimony is the exception rather than the rule, and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'").[8]

The flexibility of the inquiry envisioned by Rule 702, the illustrative nature of the *Daubert* factors, and the considerable leeway a trial judge must have in deciding whether expert testimony is reliable, were dominant themes of *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999). *Kumho* settled a conflict in the circuits regarding *Daubert*'s application to "technical," as opposed to "scientific," testimony. While the Court held that the basic gatekeeping obligation created in *Daubert* applies equally to testimony based on technical and other specialized knowledge, *id.* at 141, 147-49, it recognized that there are many different kinds of experts and many different kinds of expertise. *Id.* at 150. *See, e.g., United States v. Bighead*, 128 F.3d 1329, 1330 (9th Cir. 1997) (expert testimony involving typical characteristics of child sexual abuse victims involve specialized knowledge rather than scientific theory); *United States v. Alonso*, 48 F.3d 1536, 1541 (9th Cir. 1995) (expert testimony by law enforcement officer regarding why innocent conduct might in fact be indicative of criminality.).

Since the gatekeeping inquiry must be tied to the facts of the particular case, *id.* at 150, the Court held that a trial court may – but is not required to – consider "one or more of the more specific factors that *Daubert* mentioned when doing so will help determine the testimony's reliability." But, the Court stressed, those factors, which were meant "to be helpful, not definitive," "'neither

---

[8] Since at least the time of Blackstone, it has been felt that the goal of evidentiary reliability can best be assured by testing the evidence in the "crucible of cross examination." *Crawford v. Washington*, 541 U.S. 36, 61-62 (2004).

necessarily nor exclusively apply to all experts or in every case." *Id.* at 142. Their applicability will depend on "'the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Id.* at 150. Ultimately, the particular procedure employed will depend largely on the "particular circumstances of the particular case at issue." *Id.* at 150, 152. Accord *Smith*, 215 F.3d at 719 ("The Rule 702 test is a flexible one, and no single factor is either required in the analysis or dispositive as to its outcome."). In response to *Daubert* and *Kumho*, Rule 702 was amended. It now provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

To gauge reliability, it must first be determined whether the expert is qualified in the relevant field and whether the reasoning or methodology is valid. *Daubert*, 509 U.S. at 592-93; *Smith*, 215 F.3d at 718; *Niebur v. Town of Cicero*, 136 F.Supp.2d 915, 918 (N.D.Ill. 2001) (Bucklo, J.). The expert must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire*, 526 U.S. at 152. And of course, the expert's testimony must be relevant to the task at hand. *Daubert*, 509 U.S. at 591, 597; *SEC v. Lipson*, 46 F.Supp.2d 758, 762 (N.D.Ill. 1999). Just as proof of negligence in the air will not do, *Palsgraf v. Long Island RR*, 248 N.Y. 339, 344 (1928) (Cardozo, C.J.), neither will proof of expertise in the abstract. A snappy resume does not ensure admissibility.

# A
## Reliability

### 1
#### Mr. Toczyl's Qualifications [9]

Mr. Toczyl was drafted during the Korean War in the midst of his junior year at Illinois Institute of Technology. Returning from the war, he worked briefly at General Motors as a junior tool engineer before taking a position in 1954 with Dalstrom Machine Works, a manufacturer of "precision blanking lines." He "started as a machine designer and progressed to their R & D work." After nine years with Dalstrom, Mr. Toczyl founded his own company, Fort Equipment, which manufactured precision blanking and slitting lines. Fort Equipment manufactured approximately fifty such lines over a five-year period, until Cincinnati, Incorporated, "one of the larger machine tool manufacturers in the world," purchased the operation. Mr. Toczyl remained with the company in the capacity of Vice President and General Manager until 1972, when he started a consulting firm, R & D Metal Systems. (Toczyl Deposition at 17-19, Exhibit C to Defendants' Memorandum.).

In 1975, no longer restricted by his non-compete agreement with R & D Metal Systems, he returned to the manufacture of slitting and specialty blanking lines, founding Chicago Slitter, Incorporated. Chicago Slitter specialized in lines for the automobile industry, which Mr. Toczyl said was "much more sophisticated than the average line." He sold the company in 1993 to Grotnes Machines, but remained on after the acquisition. *Id.* at 24-26.

Mr. Toczyl became semi-retired in 1999, but continues to do consulting in the industry. One of his major clients is Mestech for which he is "evaluating some new concepts they are planning to

---

[9] An expert's qualifications bear upon reliability. *United States v. Taylor*, 154 F.3d 675, 683 (7th Cir. 1998).

bring to the marketplace," involving "coil processing line designs." *Id.* at 9.

While conceding that Mr. Toczyl is knowledgeable and skilled when it comes to the use of a blanking line, DBI argues that a "user" of a machine – who has no college degree or a degree in mechanical, electrical, or design engineering – is not thereby qualified to give expert opinion on design related matters. (Motion, at 6-7). Exclusive reliance is placed on two Illinois Appellate Court decisions which hold that experience in using a piece of equipment, without more, do not qualify the user as an expert in products liability cases to testify about alternative designs that could have prevented the injury. *See Cleveringa v. J. I. Case Co.*, 230 Ill.App.3d 831, 595 N.E.2d 1193, 1208 (1st Dist. 1992); *McCormick v. Bucyrus-Erie Co.*, 81 Ill.App.3d 154, 164, 400 N.E.2d 1009 (3rd Dist. 1980).[10]

These cases do not control here, and not because general propositions do not decide concrete cases,[11] and certainly not because they are state cases. They are inapplicable here because the facts

---

[10] In *McCormick*, the project manager and superintendent of a contractor were not allowed to give their opinion on the effect of adding additional counter weight in relation to the collapse of a boom which injured the plaintiff. Since the question presented called for a "technical answer based on some study and analysis of the specific variables involved and since neither man possessed qualifications in the area of boom construction and design and since neither man had made any calculations, done any studies nor made any analysis whatsoever on the relationship between extra counter weight and boom strength and stress," 400 N.E.2d at 1016, the Appellate Court sustained the trial court's refusal to allow their testimony.

In *Cleveringa*, an individual with experience in laying underground cable and in using boring machines was not qualified to testify as an expert that an accident involving a Case maxi-sneaker "could have been prevented if a safety switch had been included in the maxi-sneaker's design." 559 N.E.2d at 1208.

[11] *Lochner v. New York*, 198 U.S. 45, 76 (1905) (Holmes, J., dissenting). *See also Daubert*, 509 U.S. at 598 (Rehnquist, C.J., concurring in part and dissenting in part)("general observations" suffer from the common flaw that they are not applied to the specific matter and "therefore they tend to be not only general, but vague and abstract.").

are so dissimilar: this is not a products liability case in which alternative designs of a piece of equipment are involved, and Mr. Toczyl is not simply a "user" of a blanking machine. These cases, and the principle that they enunciate, might be applicable if Loeffel had attempted to qualify the operators of the Line (or perhaps even its plant manager and plant supervisor) as experts. But that is not who it has proposed as its expert.

Nothing in the text, purpose, or history of Rule 702 supports the notion that formal education or training is an indispensable prerequisite to a finding of testimonial competency. Indeed, the uncompromisingly plain language of the Rule refutes it. Rule 702 provides that a witness may be qualified as an expert "by knowledge, skill, experience, training, or education." Whether Rule 702's placement of education at the end of the list was intentional is uncertain. What is certain, however, is that "experience... of all teachers the most dependable," *Funk v. United States*, 290 U.S. 371, 381 (1933), is, in certain fields the predominant, if not the sole, basis for a great deal of reliable expert testimony. *United States v. Allen*, 269 F.3d 842, 846 (7th Cir. 2001). *See also Smith*, 215 F.3d at 718; Advisory Committee Note to Rule 702; 29 Wright and Gold, Federal Practice and Procedure, §6264 at 234-237 (1997).

Thus, Mr. Toczyl's extensive involvement over the last fifty years with companies that manufactured the kind of machine that Loeffel purchased from DBI would seem to qualify him to assess the performance of a blanking machine and whether it performs in conformity to a set of technical specifications. If such questions of conformity do not involve the machine's "use" – and DBI concedes Mr. Toczyl is qualified to testify on that topic – it is difficult to imagine what does.

We think unpersuasive the objection that Mr. Toczyl's running of a company that manufactured precision blanking lines "does not prove that he *personally* engineered or designed the

lines. . . ." (Reply at 6) (Emphasis supplied). "An expert need not necessarily have specific experience with a particular facet of his or her expertise in order to be competent to testify as to that facet." *Hawthorne Partners v. At&T Technologies, Inc.*, No. 91 C 7167, 1993 WL 311916 at *3 (N.D.Ill. Aug. 11, 1993). A lack of specialization generally does not affect the admissibility of the opinion, only its weight. *Wright v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991); *Hawthorne Partners v. At&T Technologies, Inc.*, 1993 WL 311916 at *3.

An individual who, like Mr. Toczyl, has spent a protracted period running a company that manufactures the kind of machine involved in this case has sufficient specialized knowledge gained through that experience that he can be qualified as an expert on all manner of things relating to the machinery. *See generally*, Wright and Gold, Federal Practice and Procedure §6265 (1997).

Thus, a witness qualified as an expert in a products liability action was not strictly confined to his area of practice, but was allowed to testify about related applications. In *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2nd Cir. 1995), an engineer, based upon "extensive practical experience," was deemed qualified to testify as an expert in a product liability action against the manufacturer of hot-melt glue as to the issue of whether plaintiff was in the "breathing zone" of the glue's fumes in the workplace. The Second Circuit characterized as a quibble the defendant's objection to the expert's lack of academic training in fume dispersal patterns or experience interpreting air quality studies, and his lack of knowledge regarding the chemical constituents of the fumes or the glue vapor's concentration level. These matters, the Court said, went to the testimony's weight and credibility, not its admissibility.

In *Davis v. American Jet Leasing, Inc.*, 864 F.2d 612 (8th Cir. 1988), the Court held that an individual who had been a licensed pilot since 1946 and had been the operator of a jet sales and

15

leasing company, similar to that of the defendant, for over ten years had sufficient specialized knowledge to testify as an expert about the defendant's aircraft maintenance program. The fact that he was not an FAA licensed mechanic went to the weight, not the admissibility of his testimony. In *Huval v. Offshore Pipelines, Inc.*, 86 F.3d 454 (5th Cir. 1996), the witness's extensive 32-year background in the insurance industry with experience as an underwriter, accounts manager and underwriting manager qualified him as an expert even though he had no experience acting as an insurance agent where an insurance consultant was involved and no experience working directly with a London broker – two facts that were significant in the case.

Perhaps more importantly, Mr. Toczyl testified at his deposition, that he has substantial experience in the design and manufacture of blanking and slitting machines. It is no answer to say that this testimony must be rejected because uncorroborated. (Reply at 6-7). So rigid a requirement is incompatible with the liberal thrust of Rule 702,[12] the flexibility mandated by *Daubert,* and with the broad discretion courts have to determine reliability. *Daubert* requires trial judges to be gatekeepers, not Gryphons.

Of course it is possible that Mr. Toczyl stretched to unacceptable limits the truth about his background. But that is possible with every witness in every case. *Daubert* and *Kumho* teach that the anodyne for shaky testimony is not exclusion but cross-examination. Disputes as to the strength of Mr. Toczyl's credentials go to the weight not to the admissibility of his testimony. *See McCullock*, 61 F.3d at 1044; *United States v. Bellanger*, 1997 WL 833874 at *10 (A.F.Ct.Crim.App. 1997).

---

[12] *See Daubert*, 509 U.S. at 588-89, 593; *Holbrook v. Lykes Brothers Steam Ship Co, Inc.*, 80 F.3d 777, 782 (3rd Cir. 1996); *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990); Wright and Gold, Federal Practice and Procedure §6265 at 251-252 (1997).

A defendant in a criminal case may, consistent with proof beyond a reasonable doubt, lose his liberty (or his life) on the uncorroborated testimony of an admitted perjurer, a convicted felon, or an accomplice. *United States v. Wallace*, 32 F.3d 1171, 1173 (7th Cir. 1994); *United States v. Beverly*, 913 F.2d 337, 358 (7th Cir. 1990), *aff'd on other grounds sub nom, Griffin v. United States*, 506 U.S. 46 (1992). It would be odd indeed, if the preliminary question of admissibility under Rule 104, which is governed by the far more relaxed requirement of proof by a preponderance, *Huddleston v. United States*, 485 U.S. 681, 687 (1988), depended on corroboration of background information given at a deposition by the putative expert. DBI's counsel made no attempt at Mr. Toczyl's deposition to explore his design background and experience. Perhaps this was an oversight, perhaps a strategic decision made to set the stage for the argument now advanced. No matter. The result is the same. On the present record, there is enough to conclude that Mr. Toczyl is qualified to give the opinions in his Report.

Nor is it a valid objection to tendentiously characterize as "self-serving" Mr. Toczyl's testimony about his background. All testimony offered by or on behalf of a party may fairly be said to be self-serving; why else would it be offered. *See Payne v. Pauley*, 377 F.3d 767, 772 (7th Cir. 2003); *United States v. Bucur*, 194 F.2d 297, 301 (7th Cir. 1952). But there is no rule of evidence that warrants, let along requires, exclusion on that ground. *See United States v. Matot*, 146 F.2d 197, 198 (2d Cir. 1944) (L.Hand, J.). While the term appears from time to time in cases, it "is a misnomer that ought to be interred. It has long obscured the proper application of the hearsay rule to the reception of evidence, and is not an independent ground for objection." *Chestnut v. Ford Motor Co.*, 445 F.2d 967, 972 (4th Cir. 1971). *Accord Chicago Milwaukee St. Paul and Pacific RR v. Alva Coal Corp.*, 365 F.2d 49, 56 (7th Cir. 1966). *See also Payne*, 377 F.3d at 772 (7th Cir. 2003)

(summary judgment affidavits not excludable because "self-serving.").[13]

Moreover, Mr. Toczyl's Report and expected testimony focus on whether the Line meets the performance specifications in the sales contract. He was not engaged to ferret out design and engineering flaws and offer a better, alternative blueprint for the Line. While Mr. Toczyl did advert as to possible design problems, the tenor of those portions of his testimony was criticism of DBI for either failing to design a machine that met the contract's specifications or failing to accurately articulate the machine's capabilities. (Toczyl Deposition at 151-53). This simply focuses on the machine's performance, and Mr. Toczyl is sufficiently qualified to testify as to that.[14]

The subject of Mr. Toczyl's testimony – and the issue in this case – is not how to design and build a multi-blanking line, but whether the multi-blanking line DBI sold to Loeffel performs properly. As he specifically indicates in his Report, his opinions regard "the DBI line . . . including: its overall production capabilities, the performance of various components of the line, and whether the line produces steel product as specified in the DBI-[Loeffel] contract." (Report at 1). Given Mr. Toczyl's lengthy experience with multi-blanking lines – including, according to him, their design and manufacture, DBI's contention that he is unqualified to testify in this case is not persuasive.

## 2
## Mr. Toczyl's Methodology

Prior to his day-long evaluation of the Line, Mr. Toczyl reviewed the specifications in the

---

[13] Statements of motive, intent, mental state, admissible under Rule 803(3) are not excludable even when highly self-serving. *United States v. DiMaria*, 727 F.2d 265, 271 (2nd Cir. 1984) (Friendly, J.).

[14] We do not agree that in order for Mr. Toczyl's testimony to be helpful it would need to help the trier of fact in its understanding of "any of the possible solutions." (Reply at 12). The question is whether the Line performs in accord with the contract specifications. In any event, Mr. Toczyl has said that the problems are irremediable

contract, correspondence between Loeffel and DBI, the minutes of a DBI design team meeting, a report DBI service technicians drafted, reports Industrial Magnetics, Inc. representatives prepared, and a wide variety of blueprints, schematics, and promotional materials on the Line. Of the twelve hours he spent at Loeffel's plant, eight were devoted to observing the Line while it was running during the course of a normal work day, servicing four separate customer orders.

During the production runs, Loeffel employees Tim Freitag, the plant manager, and Frank Ontiveros, a plant supervisor, assisted Mr. Toczyl by monitoring the speed of the Line as it was running and simultaneously relaying that information to Mr. Toczyl as he observed the production runs. Mr. Toczyl moved between the Line's console and the measuring station. (Toczyl Deposition at 108, 109, 120, 145). He testified that he had no way of monitoring the Line's speed "on an individual basis." *Id.* at 38, 39. Similarly, the employees would measure the blanks, sometimes by tape measure, sometimes by vernier, and relay their findings, while Mr. Toczyl observed. He personally verified and observed a number of the measurements, and he observed that the disparities between blank sizes were often significant enough to be obvious even without measurement. *Id.* at 38-39, 57-63, 108, 145. Even at 70 fpm, Mr. Toczyl observed that there were pieces that, while within tolerance, were not stacking correctly. *Id.* at 144.

Mr. Toczyl's use of the relayed information is claimed to render his testimony inadmissible because the Loeffel employees are "biased" "inexperienced" and "admittedly inexpert. . . ." (Motion at 9, 11-12, 14-16; Reply at 11). According to DBI, this use, coupled with Mr. Toczyl's claimed failure to have conducted scientific testing or independent or market research, or to have relied on published studies renders his methodology "mere junk science." (Motion, at 8-10).

19

### The Absence of "Scientific" Testing, Market Research and Peer Review

DBI's insistence on rigid compliance with the *Daubert* factors is at odds with the non-mandatory nature of those factors, the "considerable leeway" courts have in deciding in a particular case how to determine reliability, and the fact that those factors may have no relevance in particular cases. See, e.g., *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 n.4 (9th Cir.) (Kozinski, J.), *cert. denied*, 516 U.S. 869 (1995). Where "the relevant reliability concerns may focus upon personal knowledge or experience," *Kumho Tire*, 526 U.S. at 150, it would be difficult or impossible to apply the *Daubert* these factors. *See, e.g., United States v. Brown*, 7 F.3d 648, 653 (7th Cir. 1993).

It is precisely because this is such a case that it makes little sense to ask whether there has been peer review. Moreover, "lack of peer review will rarely, if ever, be the single dispositive factor that determines the reliability of expert testimony." *Smith*, 215 F.3d at 720-21. In *Smith*, the expert was merely applying well established engineering techniques to the particular materials at issue in the case. Thus, his failure to have submitted those techniques to peer review established nothing about their reliability. *Id.*

While there may be a meaningful distinction between "personal observation" and "test" under other circumstances, in this case, Mr. Toczyl's observation of production runs was a perfectly acceptable way to "test" the performance of the Line.[15] Personal observation is deemed often to be

---

[15] In that way, Mr. Toczyl could gain a general perspective of the performance of various components of the Line without interruption to take measurements at specific points in the Line himself. The goal, after all, was to determine whether DBI's machine could perform under ordinary working conditions, not on a sporadic basis while runs were interrupted for Mr. Toczyl to take measurements and readings at various points in the Line.

the most reliable source of information. *Daubert*, 509 U.S. at 590 n.9. "Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from... specialized experience.'" *Kumho Tire*, 526 U.S. at 148. That is what Mr. Toczyl did, and his conclusions are capable of empirical validation (or refutation) by additional runs. *Id.* at 593.[16] *See Clark v. Takata*, 192 F.3d 750, 758 (7th Cir. 1999) (hands on testing is a reasonable methodolgy).

Chapman v. Maytag, 297 F.3d 682 (7th Cir. 2002) and *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994), *cert. denied*, 512 U.S. 1222 (1994) – on which DBI relies – are not a basis to exclude Mr. Toczyl's testimony. Neither *Chapman* nor *O'Connor* dealt with a case where reliability concerns focus on personal knowledge or experience. In *O'Connor*, a doctor opined that cataracts were radiation-induced based solely on observation *contrary to accepted medical practice*. The Seventh Circuit adhered rather strictly to the *Daubert* factors in barring his testimony based on an untested scientific theory.

In *Chapman*, the proposed expert had an undergraduate degree in mechanical engineering but no background of any kind in electrical engineering, the only specialty with any relevance to the issue of whether the stove's electrical wiring was defective. The "expert" had advanced a theory based solely on his own speculation and unsupported by any study or writing. Indeed, while the expert assured the court that he was currently designing a testing procedure to prove his theory, he never did. In short, the testimony was nothing other than unsupported speculation and the subjective belief of the witness. Little wonder he was not allowed to testify. 297 F.3d at 688.

---

[16] The proposed expert's failure even to have visited the site where the machine that injured the plaintiff was housed was a matter of concern to the Court in *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1999).

It was in the defining and limiting context presented by *Chapman* that the Court of Appeals said that "'[p]ersonal observation is not a substitute for scientific methodology and is insufficient to satisfy *Daubert*'s most significant guidepost.'" 297 F.3d at 688. And it is in this defining and limiting context, not in the very different context presented here, that *Chapman*'s general observation must be understood. *See, Cohens v. Virginia*, 19 U.S. 264, 399 (1821)(Marshall, C.J.); *Illinois v. Lidster*, 540 U.S. 419, 424 (2004); *Colon v. Option One Mortgage Corp.*, 319 F.3d 912, 921 (7th Cir. 2003); *Tech Telecom v. Amway Corp.*, 174 F.3d 862, 866 (7th Cir. 1999) (Posner, C.J.); *NLRB v. Keller-Crescent Co.*, 538 F.2d 1291, 1300 (7th Cir. 1976).

DBI has altered the sentence in *Chapman* to read this way: "'Personal observation is not a substitute for scientific methodology and is insufficient to satisfy Daubert's most significant guidepost [*general acceptance*].'" (Reply at 9) (Emphasis supplied). The most significant guidepost is not "general acceptance," but "scientific methodology." *Chapman*, 297 F.3d at 688. Indeed, *Daubert* rejected the "general acceptance" test of admissibility that had prevailed in the federal courts since 1923. While the Court said that general acceptance "can yet have a bearing on the [reliability] inquiry, 509 U.S. at 594, it was the last factor mentioned. This kind of tampering with quotes serves no useful purpose and is improper. *Cf. Cox v. CFTC*, 138 F.3d 268, 275 (7th Cir. 1998); *United States v. Paceli*, 491 F.2d 1108, 1120 (2d Cir. 1974).

Although DBI finds the absence of market research significant, it does not say what kind of market research could or should have been performed or how it would have illuminated the question of the particular DBI machine's performance or related in any way to Mr. Toczyl's conclusions that the Line did not perform up to snuff. DBI does not explain what kind of laboratory tests could have

22

been done to determine whether the Line performed in accordance with the specifications.[17]

The 8-hour production run observed by Mr. Toczyl was itself the "test." Nor does DBI explain how industry studies or publications would bear on the performance of *the* Line Loeffel purchased from DBI. Industry studies that showed that the model of the Line purchased by Loeffel worked splendidly throughout the country – if they existed – would not invalidate in the slightest Mr. Toczyl's conclusions that the particular machine he observed performed in a very different way. Even if such studies were somehow admissible in support of a counter-expert's testimony, they would only constitute the kind of contradictory evidence that *Daubert* said should be the curative for admissible but shaky testimony. Finally, in contexts where the *Daubert* factors were properly applied, the absence of corroborating studies or textual authority was not deemed necessarily to require exclusion of the proposed testimony. *See McCullock*, 61 F.3d at 1044.

*Daubert* grants "the trial court broad latitude to determine" "whether *Daubert's* specific factors are, or not, reasonable measures of reliability in a particular case. . . ." *Kumho Tire*, 526 U.S. at 153. The absence of those factors are *not,* in the factual setting of this case, "reasonable measures of the reliability of [Mr. Toczyl's] expert testimony." *Id.* at 152.

**b**
**The Reporting of Line Speeds and Production Measurement By Loeffel Employees**

One of DBI's most vigorously advanced arguments is that Mr. Toczyl's methodology constitutes "junk science" because he based his conclusions on Line speeds and production

---

[17] As Mr. Toczyl admitted at his deposition, and as DBI points out, tests could have been performed to determine the exact cause of certain problems the Line was experiencing. That they were not does not affect Mr. Toczyl's conclusions about the Line's non-compliance with the sales contract's specifications. This is not a product liability case in which exact causes and alternative designs play an indispensable role.

measurements as reported by Loeffel employees, who are variously described as "unqualified," "inexperienced," "biased," "inexpert," and "admittedly inexpert." (Motion at 14-15, 19; Reply at 10-11). Although not developed or phrased this way, DBI's argument appears to be that since the employees were biased and inexpert, the measurements they conveyed to Mr. Toczyl are inherently unreliable.

Neither Rule 703, any other Rule of Evidence, or any case is cited in support of the claim that Mr. Toczyl's testimony must be excluded because he relied on the Line speeds and measurements provided to him by Loeffel employees, and nothing is cited to support the *ipse dixit* that the employees were inept. Statements in lawyers' briefs don't count,[18] and the available evidence would seem to point to the contrary conclusion. In any event, the claim of ineptitude is at odds with DBI's claim that there is no need for Mr. Toczyl to testify since the Loeffel employees are more knowledgeable about the Line than he.[19]

Where an expert's opinion is based on information supplied by others, the inquiry into reliability must be made on a case by case basis and should focus on the reliability of the opinion and its foundation, rather than merely on the fact that it was based technically speaking, on hearsay. In *Walker v. Soo Line R. Co.*, 208 F.3d 581, 587 n.3 (7th Cir. 2000), *cert. denied*, 531 U.S. 930 (2000),

---

[18] *See Alioto v. Marshall Field's & Co.*, 77 F.l3d 934, 935 (7th Cir. 1996); *Car Carriers Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984); *J. M. Mechanical Corp. v. United States*, 716 F.2d 190 (3rd Cir. 1983); *McCrimmon v. Kane County*, 606 F.Supp. 216, 225 (N.D. Ill. 1985).

[19] The reporters of the information were Loeffel's plant manager and a plant supervisor. Only tendentious speculation supports the claim of ineptitude, and that is not enough. *Cf.*, *Pacman v. Chicago Tribune Co.*, 267 F.3d 628, 637 (7th Cir. 2001). Given the contemporaneity of the reporting by Loeffel employees with the fast moving events themselves, there seems little opportunity for fabrication.

the rather obvious bias of the plaintiff was not a bar to the expert's testimony which was based in part on her self-reported medical history. *Accord Cooper v. Carl A. Nelson & Co.*, 211 F.3d at 1008, 1019 (7th Cir. 2000).

*Soden v. Freightliner Corp.*, 714 F.2d 498 (5th Cir. 1983) teaches that even reliance on data prepared for litigation by a source with a demonstrable motive to falsify is not necessarily unreliable. In *Soden*, the defendant's expert was not allowed to testify about certain calculations he made based on statistics prepared by a sister company and for the litigation. The data was never made available to the plaintiff until its attempted introduction at trial. *Id.* at 501, 503. While the district court's exclusion of the testimony was sustained as an appropriate exercise of discretion, the Fifth Circuit emphasized that the seeming bias of the source supplying the underlying data and its preparation for the litigation "standing alone do not suffice to impugn the reliability of the statistics, but do properly signal a trial judge to make a critical review of their bases. *Id.* at 503. It was the presence of a number of other factors that led the Court of Appeals to conclude that the testimony was properly excluded. *See id.* at 503-505.

There is no requirement that an expert "personally perceive the subject of his analysis." *NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 790 (7th Cir. 2000). The practice of employing experience to analyze data assembled from others is neither illicit nor unusual. *Phillips v. Raymond Corp.*, 364 F.Supp.2d 730, 743 (N.D.Ill. 2005). Of course, an expert cannot rely on data of known unreliability. But that is not the case here. Even if there were a question of the competency of those transmitting the information to Mr. Toczyl, it would be a matter affecting the weight, not the admissibility of Mr. Toczyl's testimony.

Merely because there is an economic relationship between Mr. Freitag and Mr. Ontiveros and

Loeffel from which an inference of bias could properly be inferred, does not make their reporting of Line speeds and measurements inherently unreliable, thereby requiring, as a matter of law, exclusion of testimony based on that reporting.[20] Bias goes to credibility, and credibility is a question exclusively for the trier of fact. *United States v. Abel*, 469 U.S. 45 (1984); *United States v. Frankenthal*, 582 F.2d 1102, 1106 (7th Cir. 1978). *See also Daubert*, 509 U.S. at 596. Indeed, if possible bias were a presumptively disqualifying factor, few paid experts – and none are not paid – could ever testify.

As a general rule, questions relating to the bases and sources of an expert's opinion affect only the weight to be assigned that opinion rather than its admissibility. *United States v. 14.38 Acres of Land, More or Less Situated in Lefore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996). That Rule seems especially pertinent here in light of DBI's insistence that Mr. Toczyl shouldn't be allowed to testify because he would be doing nothing more than "rehashing" what the Loeffel employees would testify about, and they, after all, are more familiar with the Line than he. But the claim that the Loeffel employees are sufficiently knowledgeable about the Line that only their testimony is needed, seems hopelessly inconsistent with the simultaneously advanced claim that they are inexpert, unqualified, inexperienced bunglers, whose reporting of Line speeds and measurement of blanks is questionable.

Even if one were to question the data reported to Mr. Toczyl, it does not follow that his

---

[20] Implicit in the bias argument is the unarticulated and unacceptable assumption that the Loeffel employees either consciously or unconsciously lied about their observations. Of course, DBI is careful not to make the accusation directly, but it lies beneath the surface nonetheless. The competency and the motivation of the Loeffel employees are matters for trial, not a presumptive basis for exclusion of expert testimony. *Daubert*, 509 U.S. at 596; *Smith*, 215 F.3d at 718.

testimony must be excluded. Where an expert's opinion is partly based on an inadmissible ground, his opinion is nonetheless admissible if supported by other independent bases upon which he relied. *Arkwright Mutual Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997). Mr. Toczyl's half-century of experience with blanking machines qualifies him to be able to recognize speed changes and to testify about production and performance problems arising as the observable speeds varied. Even non-experts can testify to the speed of a vehicle under Rule 701. *Asplundh Mfg. Div. v. Benton Harbor Engineering*, 57 F.3d 1190, 1197 (3rd Cir. 1995). So experienced an individual as Mr. Toczyl can testify about observable speed changes in the Line. The same analysis applies to the measurements of the end products, at least to a certain degree.

There appears to be an additional basis for rejecting DBI's claims that the Loeffel employees' reporting of Line speeds and measurements should not have been used by Mr. Toczyl. Rule 803(1) of the Federal Rules of Evidence allows as an exception to the hearsay rule a statement describing an event or condition made while the declarant was perceiving it. Claims that the declarant was biased or inexpert would go to the weight, not the admissibility of the testimony. The Rule has not been raised by the parties, and we need not definitively decide its applicability. It is enough to say that there has not been a sufficient showing of financial or other incentives or a pervasive incompetency that, at this juncture, it can be concluded there is an unacceptable risk to the reliability of the data provided to Mr. Toczyl.

Perhaps in the last analysis, DBI's complaint about the source of the Line speeds and measurements is academic. Loeffel has said – and DBI has assumed – that Messrs. Freitag and Ontiveros will testify at trial. (See Loeffel Response at 18; Reply at 13). If they do, DBI's present objections will vanish. Rule 703, after all, provides that an expert may base his testimony on matters

made known to him at trial. If they do not, there will be time enough to determine the applicability of the principle in cases such as *In re James Wilson Associates*, 965 F.2d 160, 172-73 (7th Cir. 1992).

c

## DBI'S Miscellaneous Objections and Criticisms

DBI's complaint that Mr. Toczyl assumed the very thing he was hired to prove based on what he was told by Mr. Loeffel is, as Justice Frankfurter said in another context, "a horse soon curried." *Olberding v. Illinois Central RR*, 346 U.S. 338, 340 (1953). When asked at his deposition whether his opinions were formed on the basis of things told him by Mr. Loeffel and his associates he said, "not really." (Toczyl dep. at 38). He went on to explain that Mr. Loeffel told him what he expected the Line to do and why the Line wasn't going to meet his expectations and those in the contract. His conclusion the Line did not perform was based, not on a blind acceptance of what Mr. Loeffel or others said, but on the 8 hours "review of the production of four work orders." *Id*. at 41.[21] In short, unlike the expert in *Clark v. Takata Corp*, 192 F.3d at 758, who assumed the answer to the question he was hired to investigate, Mr. Toczyl did not assume that the Line didn't work. Rather, he tested it to see *whether* it would. But even if he began with an assumption – namely that the Line wouldn't work – he went on to test the hypothesis, and that is what the scientific method is all about. *Daubert*, 509 U.S. at 593.

DBI also questions Mr. Toczyl's opinion that the tooling provided in the Line was inadequate to meet the specifications of the contract, characterizing it as based solely on speculation, and faulting him for not knowing whether the tooling was "ultra-precision." This misperceives Mr. Toczyl's testimony. Mr. Toczyl provided a lengthy explanation of why the open arbor of the Line

---

[21] He was clear that there was no reliance on any anecdotal reporting of deficiencies by Loeffel or his employees. *Id*. at 39.

could not achieve the width tolerances specified in the contract, stating that a packed arbor would be necessary to meet those specifications. (Toczyl Deposition at 75-79).[22]

He said that in his 49 years of experience, he had never seen an open arbor accomplish the type of tolerances specified in the contract. He also said that this was the first steel processing line he had ever observed that was designed to handle surface sensitive materials that allowed for metal to metal contact on the stacker without the appropriate differential speed protection. (Report at 8). Under the "liberal" standard of relevance defined in Rule 401, *Daubert*, 509 U.S. at 587; *EEOC v. Indiana Bell*, 256 F.3d 516 (7th Cir. 2002), this testimony has at least some "tendency to make the existence of [a] fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Compare, United States v. Platt*, 435 F.2d 220, 224 (7th Cir. 1970), *cert. denied*, 402 U.S. 913 (1971) (attorney allowed to testify that in his years of experience he had never before seen a certain kind of described motion in a foreclosure proceeding).

The same misapprehension of Mr. Toczyl's deposition testimony underlies DBI's complaint that his methodology is flawed because he was unfamiliar with ASTM standards – the standards specified in the sales contract for measuring sheet flatness coming of the Line.[23] Mr. Toczyl testified that he did not know the particular ASTM standard at the moment, but that he had used them on

---

[22] He explained that the problem was with the way the knives were configured in the arbor, as opposed to whether they were ultra-precision. Beyond that, he stated that he observed the operators measuring the blanks and, when the product was found wanting, applying control devices to get the machine to perform properly. (Toczyl Dep. at 77-80). Experience and observation are not mere speculation.

[23] The American Society for Testing and Materials (ASTM) is a not-for-profit organization that provides a global forum for the development and publication of voluntary consensus standards for various materials, products, systems and services in over 130 varied industry areas.

occasion, and he had found that they correlated with AISI standards, with which he was familiar. (Toczyl Dep. at 84, 96, 99). These are all matters that undoubtedly will be part of Mr. Toczyl's direct and cross-examination. They bear on questions of credibility and competency, not on admissibility.

The same is true of Mr. Toczyl's opinion that a tooling change cannot be accomplished in the 90 seconds specified in the sales contract. DBI's arguments that Mr. Toczyl's opinion failed to take into account the industry definition of a tooling exchange presupposes that the testimony of DBI's vice president of automation and engineering regarding that definition is correct. Perhaps Mr. Barrons is right, and Mr. Toczyl has missed the mark rather badly. But that determination can only be made at trial.[24]

## B
## The Evaluation of "Relevance" or "Fit"

Rule 702 requires that the evidence or testimony assist the trier of fact to understand the evidence or determine a fact in issue. This condition goes primarily to relevance. *Daubert*, 509 U.S. at 591. Judge Kozinski, in his opinion in *Daubert* following the Supreme Court's remand, put it this way: "[W]e must ensure that the proposed expert testimony... logically advances a material aspect of the proposing party's case. The Supreme Court referred to this second prong of the analysis as the 'fit' requirement." 43 F.3d at 1315.

Here, a material aspect of Loeffel's case is whether the Line fails to perform according to

---

[24] Mr. Barrons' testimony was equivocal even at that, as he alternately stated the 90-second period referred to the time it took to: (1) push the tooling on; (2) either push the tooling on or off; or (3) putting some locking mechanisms in place. (Motion; Ex. D, at 113-115). Even if this were an appropriate issue for a reliability analysis, DBI's argument would fair rather poorly as it is unsupported by the testimony on which it relies.

contract specifications. Mr. Toczyl observed and evaluated the Line as it was put to the test of running four work orders. His testimony pertains to the overall performance of the Line, its various components, and how the performance of one component might affect the performance of others. By any measure, this testimony "fits" the issues in the case.

The availability of Mr. Freitag and Mr. Ontiveros and others to testify at trial is not a basis for barring Mr. Toczyl from testifying. His testimony offers substantially more than theirs. Bringing to bear a half century of experience with complex machines like that sold to Loeffel, Mr. Toczyl can illuminate and explain the problems, testifying not only to his observations of the machine's failures on a given day, but also can give an informed opinion about a far broader range of relevant matters than can Loeffel's employees.

In any event, the claim of evidentiary overlap is, at bottom, a question of whether Mr. Toczyl's testimony would be *needlessly* cumulative under Rule 403, rather than a basis for exclusion under Rule 702. Moreover, if DBI is right that Mr. Freitag and Mr. Ontiveros are biased, inexpert and inexperienced – as it has repeatedly argued – Mr. Toczyl's testimony would not appear to be needlessly cumulative.

There is one additional consideration. While judges live in *Daubert*'s "Brave New World," *Daubert, supra,* 43 F.3d at 1315, the Supreme Court's overriding concern in Daubert was with the problem of jury exposure to confusing and unreliable expert testimony, 509 U.S. at 595-97. Where, as here, the case is tried to the Court, the *Daubert* concerns are of lesser importance. *Seaboard Lumber Co. v. United States,* 308 F.3d 1283, 1301-02 (Fed.Cir. 2002)("gatekeeping" concerns not as significant in bench trial, but *Daubert* standards of relevance and reliability must nevertheless be met); *Gibbs v. Gibbs,* 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in

31

*Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury.").

Judge Posner has expressed the view that since the primary purpose of the *Daubert* filter is to protect juries from being bamboozled by technical evidence of dubious merit, in a bench trial it is an acceptable alternative to admit evidence of borderline admissibility and give it the (slight) weight to which it is entitled:

> The Federal Circuit in *Seaboard Lumber Co. v. United States*,. . . while pointing to the concern with protecting juries from confusion, did say that the *Daubert* standard must be followed in bench trials as well. But it did not say that it must be followed rigidly in such trials. *Daubert* requires a binary choice – admit or exclude – and a judge in a bench trial should have discretion to admit questionable technical evidence, though of course he must not give it more weight than it deserves.

*SmithKline Beecham Corp. v. Apotex Corp.*, 247 F.Supp.2d 1011, 1041-42 (N.D.Ill. 2003) (sitting by designation), *aff'd on other grounds,* 403 F.3d 1331 (Fed. Cir. 2005).

### III. CONCLUSION

The defendants' motion to bar Mr. Toczyl's testimony is denied. But because he will be allowed to testify does not mean that his testimony will carry the day. The weight to be given to his testimony can only be ascertained after it is subjected to the rigors of cross-examination regarding his background, his design experience, his overall expertise with blanking machines, the circumstances of his testing of the Line, his conclusions, and all other relevant matters, and only after it is measured against contradictory evidence from Loeffel. Demeanor evidence may also play a pivotal role: "[T]he demeanor of a witness ... may satisfy the tribunal not only that the witness testimony is not true but that the truth is the opposite of his story. . . ." *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 408 (1962). *See also Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985).

Some of the issues raised by DBI may resurface at trial. If they do, and if they are appropriately raised, they may be considered in the more enlightening context that only a trial setting can provide.

**DATE:** June 8, 2005          **ENTERED:** _____

UNITED STATES MAGISTRATE JUDGE