

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **LOEFFEL STEEL PRODUCTS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. 01 C 9389** |
| | ) | **Magistrate Judge** |
| **DELTA BRANDS, INC., d/b/a DBI; and** | ) | **Jeffrey Cole** |
| **SAMUEL F. SAVARIEGO, individually,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Loeffel Steel Products, Inc. ("Loeffel") purchased from defendant Delta Brands Inc. ("DBI") a rotary shear multi-blanking line ("the Line") – a machine that cuts and stacks sheets of steel. According to Loeffel, the machine did not perform up to the specifications DBI had promised in the sales contract. It filed suit alleging breach of contract, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purposed, and fraud.

On February 25, 2004, Magistrate Judge Keys denied DBI's motion for partial summary judgment, concluding that there existed a number of genuine issues of material fact. A year later, Loeffel has now moved for partial summary judgment on the issue of liability against DBI on all but the claim for fraud. As Local Rule 56.1 ("LR") requires, it supported the motion with a statement of undisputed material facts, 134 paragraphs long, supported by a record of over 350 pages, the greater portion of which comprised excerpts from the

depositions of ten individuals, including both Loeffel and DBI employees. DBI responded with its LR 56.1 offerings, which included a 15-page, 48-paragraph statement of additional facts. These were supported by a 450-page record, the majority of which was comprised of deposition excerpts from over a dozen witnesses. Loeffel's reply was supported by an additional 150 pages of materials. In response, DBI filed a 54-page motion to strike Loeffel's reply to DBI's additional facts, which was in reality a surreply, which is not contemplated by Local Rule 56.1.[1] Loeffel responded to that. Hardly an auspicious beginning for a case where Loeffel claimed there were no disputed factual issues and it was entitled to judgment as a matter of law.

After a careful review of the complex and voluminous materials submitted by both sides, I find myself in much the same position as did Judge Keys, and like Judge Keys, I have concluded that the current motion for summary judgment should be denied. There are still present sharply divergent recollections of what was said, of what was meant, of what certain parts of the contract mean and do not mean, whether the Line performed satisfactorily, and

---

[1] Motions to strike are disfavored, because they potentially serve only to create delay. *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989); *Spearman Industries Inc. v. St. Paul Fire and Marine Ins. Co.*, 109 F.Supp.2d 905, 907 (N.D.Ill. 2000). There may be occasions where a motion to strike might remove unnecessary clutter from a case, but this is certainly not one of them. LR 56.1 governs the filing of statements of facts and responses thereto in summary judgment proceedings. The rule includes its own enforcement provisions, making motions to strike LR 56.1 statements or responses superfluous at best. *Sphere Drake Ins. Ltd. v. All American Life Ins. Co.*, 300 F.Supp.2d 606, 613 (N.D.Ill. 2003); *Lenoir v. Combined Ins. Co. of America*, No. 01 C 5267, 2002 WL 1949735, *6 (N.D.Ill. Aug. 23, 2002). As such, DBI's motion to strike is denied., Instead, I shall follow the rule in assessing the parties' statements of fact and responses thereto.

2

if not, why not, and other related issues. Although this time the motion is the plaintiff's and although this time Count V is not part of the analytical mix, a host of genuine issues of disputed fact predominate, thereby precluding the granting of summary judgment.

Judge Shadur's recent article, *Trials Or Tribulations (Rule 56 Style)?*, 29 LITIGATION 5 (Winter 2003) should be must reading for everyone contemplating a motion for summary judgment. He concluded that a meaningful cost benefit analysis would tend to favor not filing the motion in the first place. In his view, "trials not only are more fun but also are more consistent with most lawyers' preferred self image than the sterile Rule 56 path (strewn as it is with paper and nothing but paper)." *Id.* at 66. (Parenthesis in original). Hence, he concludes, "trials are indeed often better than tribulations (Rule 56 style). Counsel (particularly defense counsel) regularly should be urged by judges to consider – and that counsel should do so – the ultimately conservative alternative of trial before they proceed down the summary judgement path." *Id.* (Parenthesis in original).

## I.
## BACKGROUND

### A
### The Parties' Differing And Disputed Versions Of The Facts

#### 1
#### The Negotiations And The Ultimate Agreement

Loeffel is in the business of slitting and cutting raw steel into various lengths and widths in accord with its customers' orders. DBI is in the business of designing and manufacturing multi-blanking machines, which are designed to process coils or rolls of sheet

steel. The Line's "leveler" flattens the coiled steel as it unrolls and removes surface defects. The line can then cut the steel length-wise into sections; it can also slit the steel into strips – called "blanks" or "mults"– of various widths. As these tasks are accomplished, the "stacker" component sorts and stacks the sheets into a stacker bay.

In late 1999, Loeffel was shopping for just such a machine, and its founder, Maurice Loeffel, came across an article about DBI and its multi-blanking line in a trade publication. Coincidentally, at about the same time, DBI's vice president of sales and marketing, Gautum Mahtani, contacted Loeffel to gauge its interest in a multi-blanking line. The parties embarked upon negotiations that included a visit to a facility to observe one of DBI's similar machines, although it was a heavier gauge line – running .250-inch thick steel as opposed to .125-inch – and only cut steel to length as opposed to "multi-blanking" or "slitting."

Mr. Mahtani provided Loeffel with a quotation describing the features and components of DBI's multi-blanking line. DBI claims that Mr. Mahtani made it clear to Loeffel that the machine was the first of its kind (*Defendants' Statement of Additional Facts* ("*Def.St.*"), ¶ 12), but his deposition testimony indicates he is not so sure that was actually discussed. (*Plaintiff's Response to Def.St.* (*Pl.Resp.*, Ex. 2, at 81-82). Mr. Mahtani did say, however, that he discussed bringing other customers to Loeffel's facility for demonstrations once the Line was installed. (*Id.*). Over the course of their negotiations, the parties exchanged five revisions of the purchase agreement before finally executing a contract on

March 1, 2000, whereby DBI would deliver a rotary shear multi-blanking line to Loeffel by May 31, 2000, at a cost of $1.5 million. (*Pl.St.*, Ex. B).

The contract between the parties can be broken down into sections. The first is captioned, "Introduction," and is 1½ pages in length. In setting forth the technical advantages of the Line "versus Roll Feed Technology," DBI promises that there will be minimum down time, lower equipment costs and longer equipment life with dependable performance. After lauding the Line, there is this rhetorical question: "Is this not a lot better than having to purchase a new line with twice the cost and equipment and installation and *double personnel* requirement and cost." *Id.* at 2. (Emphasis supplied).[2] The pages of the Introduction are numbered 2 and 3, page 1 being the cover page.

Next comes that part of the contract captioned, "Equipment Summary and Price and Delivery Schedule." It runs from pages 4-6. At the bottom of page 6 are the signatures of Delta and Loeffel's Presidents. Immediately above their signatures is this instruction: "* See Annex A – which is an integral part of this agreement."

Pages 7-8 contain various specifications under the headings, "Optional Equipment," "Incoming Materials," "Finished Products," "Production Analysis (Blanking)," "Slitting Specifications," and "Production Analysis (Multiple-Blanking)." The specifications include production speeds broken down by length of steel sheets, ranges of steel thicknesses that can be leveled down to nine one-thousandths of an inch, and length accuracies down to the

---

[2] DBI's damages expert, Mr. Dohmeyer, took the position that extra personnel and extra shifts were the solution for what Loeffel claimed was wrong with the Line.

thousandth of an inch. Pages 8 through 29 are a detailed description of every conceivable aspect of the Line. They appear under the heading, "Equipment Descriptions," which is ¶3.01 of the contract and contain subparagraphs ¶1-17, which are mostly single spaced. There are on these pages as there are on earlier pages, handwritten changes. Detailed are the size and thickness of the coils of steel to be cut, leveled, and stacked; the accuracy of length and width cutting; the speed at which the machine can run in feet-per-minute ("fpm"), and other specifications and capacities. (*Pl.St.*, Ex. B, at 7-29).[3]

Under the heading, "Technical Data and Assistance," which itself appears as a subsection under "Equipment Descriptions," there appears the following clause: "DBI *guarantees* this equipment to operate mechanically within the specifications and capacities *as mentioned in this quotation* on a production basis." (*Def.Resp.*, Ex. E, D00072; *Contract* at ¶3.01, subsection 17 at p. 27) (Emphasis supplied).

The last section consists of 6 unnumbered pages, under the heading, "Annex A, (Documentation of Correspondence)." The Annex, as noted above, is expressly made "an integral part of this agreement," by virtue of the statement on page 6 of the contract. The

---

[3] The contract provided, among many other things, that the Line would run at certain tolerance and production specifications. It specified a length accuracy tolerance of .005 inch on sheets of steel with lengths of 72 inches or less, and that the leveler of the machine was to have the capacity to level steel from .009 inch through .125 inch. (*Pl.St.*, ¶¶ 14-15; Ex. B, at 7, 13). The contract also stated that the Line could operate at speeds up to 300 fpm for both single- and multi-blanking operations, depending on the desired size of the blanks. (*Pl.St.*, ¶¶ 19; Ex. B, at 7). The contract further specified that the Line could multi-blank sheets up to 72 inches wide and produce up to six 6-inch wide multiple blanks. (*Pl.St.*, ¶ 20; Ex. B, at 8). The defendants' answer admits that Mr. Savariego represented prior to the execution of the contract that the Line had a number of these specifications and capabilities. *See* Answer, ¶11 (b)(c)(f)(g)(j)(k) and (m).

Annex contains a letter dated February 9, 2000, asking Mr. Savariego 20 specific questions including, "[w]hat guarantees do you give on length and width tolerance?" Mr. Savariego responded by letter dated February 17, 2000 in which all 20 questions were answered. Paragraph 9 of his letter states, "Guarantees on Length/Width Tolerances – as per specification." The next three pages of the Annex are captioned "Points Agreed on our Telephone Conversation" and notes that DBI is not responsible for "consequential damages." The pages of the Annex, like all the pages of the contract, are initialed by Loeffel and DBI. Paragraph 13 of DBI's answer admits that it entered into a written contract on about March 2, 2000 and that the copy attached to the complaint as Exhibit 1 is the contract.

Ignoring ¶3.01, subsection 17's "guarantee" that the equipment described in the contract would "operate mechanically within the specifications and capacities as mentioned in this quotation on a production basis," DBI contends that the Annex contains the only express warranties in the entire agreement, namely that: (1) the Line will produce sheet quality and meet commercial tolerance by 4 times better than ASTM industry standards; (2) DBI agrees to a five year warranty on equipment manufactured by DBI, for all other equipment manufactured by others is subject to the specific manufacturer warranty and is one year from the date of commissioning; (3) the slitter tooling provided will be shimless tooling; and (4) the length and width tolerances are "guaranteed as per specifications." (*Def.St.*, ¶ 15).

**B**
**Performance of the Line**

**1**
**Cutting Accuracy and Production Run Speed**

Loeffel's complaints begin with the accuracy with which the Line cuts the steel blanks and the speed at which it can process them. The contract specifies that, when cutting sheets of steel to lengths of 72 inches or less, the Line would provide an accuracy tolerance of plus or minus .005 inch. (*Pl.St.*, Ex. B, at 7). It also indicated that 72-inch sheets could be processed at a speed of 300 fpm. (*Pl.St.*, Ex. B, at 8). According to Loeffel's disclosed expert, Rudolph Toczyl, once the Line begins running at a speed of 120 fpm in straight blanking mode, the promised length accuracy tolerance of .005 inch on sheets of steel with lengths of 72 inches or less cannot be achieved. (*Pl.St.*, ¶ 47; Ex. F, at 2).

At a running speed of 100 fpm, the Line could maintain length accuracies of no better than .015 inch when multi-blanking .029 gauge steel. (*Pl.St.*, ¶ 50; Ex. F, at 2-3). Loeffel's operator, Oscar Salazar, testified that observed the loss of length tolerance at operating speeds of 140 fpm. (*Pl.St.*, ¶ 48; Ex. H, at 27). The losses occurred whether the steel was oiled or dry. (*Pl.St.*, ¶ 49; Ex. H, at 28-29). Mr. Salazar explained that operators have learned to enter length figures other than those required in order to "trick" the Line to cutting the necessary length. (*Pl.St.*, ¶ 52; Ex. G, at 35-36). In other words, an operator might set the monitor to slightly less than the desired length because they have learned from experience

8

that when the Line is running faster, the sheets are cut slightly longer than the monitor would indicate. (*Pl.St.*, ¶ 52; Ex. G, at 35-36).

The speed at which the Line performs is another source of dissatisfaction for Loeffel. The contract specified that the Line would run at speeds up to 300 fpm when cutting single blanks from 36 to 240 inches long, and when multi-blanking blanks from 48 to 240 inches long. (*Pl.St.*, Ex. B, at 8). According to Tim Freitag, Loeffel's plant manager, during the first several months of operation, Loeffel could not "push" the Line "to get somewhere close to where [DBI and UNICO] said [Loeffel] can run it and [they] never did." (*Pl.St.*, ¶ 65, Ex. I, Freitag Dep., at 9-10). Within six months, Mr. Freitag said, Loeffel "basically ran the Line due to [its] schedule in production and [its] needs for the customers." (Freitag Dep., at 10). Mr. Toczyl observed four major work orders on August 26, 2003, during which the Line was unable to run at a speed greater than 140 fpm without breaking down. (*Pl.St.*, ¶¶ 66-67). He reported that the Line failed to meet the single blanking production standards set forth in the contract on the day he observed it. (*Pl.St.*, ¶¶ 69-70).[4]

Loeffel submits that the Line's optimal range of production speed was between 80 and 160 fpm, relying on the testimony of Frank Ontiveros, an Loeffel production supervisor. (*Pl.St.*, ¶71). More specifically, according to Mr. Ontiveros, the Loeffel employees ran the Line up to 120 fpm, but no higher "[b]ecause we have the hand – the employee stacking. It

---

[4] Loeffel submits that Mr. Toczyl indicated there was a noticeable drop off in blanking accuracy at 120 fpm, but cites to an unknown page in Mr. Freitag's deposition transcript in support. (*Pl.St.*, ¶ 69).

would be a dangerous situation." (Ontiveros Dep., at 19). Yet, he also testified that the maximum speed the Line had run at was 200 or 250 fpm. (*Id.*). When the Loeffel employees tried to exceed 250 fpm, Mr. Ontiveros said there were "too many problems." (*Id.*). Mr. Freitag testified that the Loeffel employees could not run light gauge material any faster than 120 fpm or they would risk damaging the sheet by hitting the backstop of the stacker. (*Pl.St.*, ¶ 72; Freitag Dep., at 15-16).

DBI's response to these assertions is in two parts. First, it questions the methodology and expertise of Loeffel's expert witness, Mr. Toczyl and reprises the arguments raised in its motion to bar his testimony: he is less than qualified, he was not circumspect in his testing of the Line, he relied for his data regarding the Line's performance on Loeffel employees, whom DBI characterizes as biased and unreliable sources. Second, DBI blames the cutting inaccuracies on Loeffel processing what it calls secondary steel through the Line. (*Def.Resp.*, ¶¶ 47-52). The parties do not dispute that the quality of the steel run through a multi-blanking line will have an effect on the Line's performance. The dispute centers rather on DBI's knowledge at the time of contracting of the kinds of steel that Loeffel planned to run on the Line.

David Barrons, DBI's vice president of automation and engineering testified that production speed was adversely affected by the quality of the steel Loeffel was processing, as well as other issues such as computer problems. (*Def.St.*, Ex. I, Barrons Dep., at 93-94). According to Mr. Barrons, at one point, Loeffel was running rusted material through the

10

Line. (Barrons Dep., at 93-94). Mr. Barrons explained that the Line could stack at the specified speed "as long as the stacker was set up and the material was of sufficient quality," although he stated the run might be interrupted by "numerous things . . . may be caused by . . . computer issues, or they may have been caused by magnetic issues, or they may be caused by material shape issues, or . . . the quality of the material." (Barrons Dep., at 93-94). He also testified that on the "best day" he had witnessed, the Line performed multi-blanking at 125 to 150 fpm, although he felt the difficulties were limited to problems with the magnets in the stacker component of the machine. (Barrons Dep., at 109-110).

At his deposition, Leroy Lance, a former DBI field technician, stated that he had never seen a DBI cut-to-length Line produce sheets at 300 fpm or a DBI stacker handle rotary shear production at 300 fpm, but expected that it could. (*Pl.St.*, ¶ 84; Ex. E, Lance Dep., at 47-48). In addition, Mr. Savariego testified that, at one point, Mr. Ontiveros was running the machine with one of its settings "too tight," and that was the cause of the damaged steel sheets. (*Def.Resp.*, ¶ 71, Savariego Dep., at 126). Mr. Savariego also testified that, as the sheets get longer than 36 inches, he has "seen [the Line] running at 300 feet per minute." (Savariego Dep., at 135). DBI also questions Mr. Ontiveros's testimony – which was somewhat unclear – regarding just what would constitute a "dangerous situation." (*Def.Resp.*, ¶ 71).

## Shimless Tooling and Tooling Exchange

One of the questions Loeffel asked in its letter of February 9, 2000 was "Slitter tooling and Knives?" The answer from Mr. Savariego is in ¶14 of his responsive letter of February 17, 2000: "Two (2) sets of Shimless Tooling are included." Both letters are part of the Annex, "which is an integral part of [the Loeffel/DBI] agreement." The "Equipment Descriptions" portion of the contract provided that Loeffel would be able to complete a tooling exchange on the Line in "less that 90 seconds." (Contract at ¶3.01, §9 at p.17 and p.18; *Pl.St.*, ¶ 16, 18; Ex. B, at 18; Ex. D, at 24, 82).

Despite the seeming clarity of these provisions, the parties quarrel over their meaning. Loeffel contends that it expected a shimless product with a software program that would significantly reduce tooling setup time. (*Pl.St.*, ¶ 18, 57-58; *Pl.Resp.*, ¶ 28; Ex. C, at 54, 58-59). Mr. Savariego testified that a shimless tooling package was simply a tooling setup that did not require the use of plastic shims to set the knives. (*Def.St.*, ¶ 28; Ex. H, at 24, 82, 87).

DBI's position initially has the appeal of the obvious – shimless means no shims. But we are dealing with a technical term, which does not have a commonly understood and generally prevailing meaning. Such a term is to be given its technical meaning. *Cf. Bristow v. Drake Street, Inc.*, 41 F.3d 345, 350-51 (7th Cir. 1995); Restatement (Second) of Contracts, §202(3)(b) (1981). And that is anything but clear. There is no proof of an industry definition, and a genuine issue of disputed fact exists. How Mr. Loeffel was given to understand that the tooling system would include a software package will be a matter for

proof at trial although he conceded at his deposition that there was no discussion of a computer program. (*Pl.St.*, Ex. C, at 58-59).[5]

The promise of a 90-second tooling exchange equally constitutes a genuine issue of disputed fact. Mr. Loeffel estimated that the changeover to a new tooling set on the Line takes 15 minutes. (*Pl.St.*, ¶ 59; Ex. C, at 58). Tim Freitag, a Loeffel plant manager, thought the exchange time was closer to 6 to 10 minutes. (*Pl.St.*, ¶ 60; Ex. I, at 71). Loeffel's expert witness, Mr. Toczyl, states that he observed employees completing the exchange in 9½ minutes or more. (*Pl.St.*, ¶ 61; Ex. F, at 4). Even DBI's field technician, Leroy Lance, testified that it took him a half-hour or so to complete an exchange, although he said that he was not attempting to set a record. (*Pl.St.*, ¶ 62; Ex. E, at 49-50). He also said he had never seen anyone complete a tooling exchange in 90 seconds. (*Pl.St.*, ¶ 63; Ex. E, at 50).

According to DBI, Loeffel is operating under a misapprehension as to what constitutes a "tooling exchange." (*Def.St.*, ¶ 28). The testimony it cites to support its position either fails to address this issue or is not included in DBI's materials. (*Def.St.*, ¶ 28; Ex. I, at 13-15; Ex A, at 57). DBI chose its motion to strike rather than its opposing brief and supporting materials as the vehicle to prove the absence of a genuine issue of fact as to what constitutes a tooling change. The motion refers to the testimony of Mr. Barrons, DBI's vice president of automation and engineering, to establish the definition. (*Defendants' Motion to Strike*, at 29). The cited testimony does not indicate what the industry definition is but, rather, what

---

[5] It would seem that he was under this impression based upon quotes from other companies. (*Pl.St.*, Ex. C, at 58).

13

Mr. Barron's definition is (*Def.Mem.*; Ex. D, Barrons' Dep. at 113-115), and, his testimony was equivocal even at that, as he alternately stated the 90-second period referred to the time it took to: (1) push the tooling on; (2) either push the tooling on or off; (3) or putting some locking mechanisms in place. (*Def.Mem.*; Ex. D, at 113-115).

Essentially then, I am left with Mr. Toczyl's idea of what a tooling exchange is and Mr. Barron's idea, which differ considerably. Perhaps there is an industry standard. But one cannot tell anything at this point beyond the clear conflict between the parties parsing of the 90-second tooling-change clause.

### c
### Leveling Performance

Loeffel also complains that the corrective leveler DBI supplied – said to work on steel in a thickness range of .009 to .125 inch – does not perform as promised. (*Pl.St.*, ¶ 31). Leveling is the process of flattening coiled steel and removing surface defects. Mr. Loeffel testified that Loeffel had "professional people" inspect the Line, and their conclusion was that it could not level steel in that range of thickness. (*Pl.St.*, ¶ 31; Ex. C, at 53). Apparently, the "professional people" to whom Mr. Loeffel referred consisted of Loeffel's expert witness, Mr. Toczyl, who observed and evaluated the Line in operation. (*Pl.St.*, ¶ 31; *Def.St.*, ¶ 35). Based on his observations, he reported that the Line cannot correct defects in steel thicknesses throughout the range of .009 to .023 inch. (*Pl.St.*, ¶¶31-32, Ex. F, Toczyl's Expert Report, at 3). He felt the machine would require an additional roller or mechanism in order to perform as the contract specified. (Toczyl's Expert Report, at 3). Loeffel also

14

relies upon the testimony of two of its workers – again, Mr. Ontiveros and Mr. Salazar – to state its case regarding the leveler's deficiencies. (*Pl.St.*, ¶¶ 33, 39). Mr. Ontiveros testified that the leveler went out of calibration frequently, and that Loeffel employees had to re-calibrate it almost every week. (*Pl.St.*, ¶ 35; Ex. G, Ontiveros Dep., at 32). Mr. Salazar testified that he observed a lot of problems achieving flatness on material of a heavier gauge than .08 inch. (*Pl.St.*, ¶ 35; Ex. H, Salazar Dep., at H).

Finally, Loeffel cites the deposition testimony of Leroy Lance, one of DBI's field service technicians, who made at least two visits to the Loeffel Steel facility in Riverdale, the second visit lasting over a week. (*Pl.St.*, ¶¶ 25-26, Ex. E, Lance Dep., at 8-9, 15-16). One of his responsibilities at the time was performing the initial calibration of the machine. (*Pl.St.*, ¶ 34, Lance Dep., at 27).[6] According to Mr. Lance, the thickness range of .009 to .125 inch represents the maximum and minimum thickness of the material Loeffel is supposed to be able to run on the Line. (Lance Dep. at 33-34). He felt that the DBI leveler could correct defects such as "wavy edges" or "loose centers" sufficiently to meet industry standards on material that was .009 inch thick. (Lance Dep. at 36-37). He allowed that the leveler would perform better on thicknesses in the middle of the .009 to .125 inch range – such as .08 inch – than it would on materials closer to the extremes of that range. (Lance Dep. at 34-35, 38). Throughout his testimony, however, Mr. Lance qualified his observations

---

[6]     Loeffel asserts that the Line's leveler was calibrated solely by DBI employees. (*Pl.St.*, ¶ 34). The record, however, clearly demonstrates that Loeffel employees also calibrated the leveler. (Ontiveros Dep., at 32).

by indicating that the grade of material being leveled had a significant effect on the capabilities of the leveler. (Lance Dep., at 37, 39).

DBI questions Mr. Toczyl's opinion with a two-page argument questioning his qualifications. (*Def.Resp.*, ¶¶ 31-32, *citing Def.St.*, ¶¶ 35-39). More specifically, however, because the Annex specifications on leveling refer to American Society for Testing and Material ("ASTM") standards, DBI questions Mr. Toczyl's familiarity with them. (*Def.St.*, ¶¶ 38, 41). Mr. Toczyl testified that he only used ASTM standards on occasion because most of his customers use AISI standards. (*Def.St.*, Ex. M, Toczyl Dep., at 84). He could not, however, testify as to the ASTM standard on "flatness" as he spoke at his deposition. (Toczyl Dep., at 85).

The applicable standards that might be applied to measure flatness throughout the steel industry, and what they mean, are a significant portion of the parties' dispute over the leveler's performance. There are issues as to whether it was common knowledge in the steel industry that a leveler could not correct certain defects completely, that the range of a leveler is 4.3:1 or 4.2:1, or that to achieve a range four times greater would require a second leveler. DBI's Mr. Savariego testified that no one in his right mind would have such expectations. (*Def.St.*, ¶¶ 24, 26; Ex. H, at 41). Loeffel simply points out that Mr. Loeffel did not share such an understanding; he was told it would be able to level .009 through .125. (*Pl.Resp.*, ¶¶ 24, 26; Ex. C, at 53-54). What is unclear from both parties' submissions is how these varying statements of range – whether stating the range to be 4.3:1 to 4.2:1 or .009 through

.125 – are comparable. They are obviously derived from two different types of scales or standards, but neither side provides an explanation as to how they compare or contrast.

DBI also maintains that the specifications for leveling contemplate Loeffel processing prime or primary steel. (*Def.Resp.*, ¶14). At his deposition, Mr. Barrons testified that the capability of the leveler to meet the specifications was dependent upon the quality of product run through the machine. (Barrons' Dep., at 73-74). According to Mr. Barrons, he had observed Loeffel running significant amounts of second rate material through the Line, including "leader strip," a material produced as a steel mill's furnaces are in the process of achieving desired temperature. (Barrons' Dep., at 74). Similarly, Mr. Savariego testified that when Loeffel ran scrap material, it adversely affected the machine's performance. According to Mr. Savariego, Mr. Loeffel understood this. (Savariego Dep., at 85-86). Even Mr. Lance, upon whose testimony Loeffel relies, indicated that the leveler's performance was tied to the grade of material being processed through the machine. (Lance Dep., at 37, 39). Again, there is testimony tending to support both parties' arguments regarding the performance of the leveler.

### d
### Problems with the Stacker

Loeffel maintains that the "stacker" component of the Line was supposed to be able to function without the use of separators during multi-blanking operations. (*Pl.St.*, at ¶¶ 21, 93). Mr. Loeffel testified that while most multi-blanking lines require divider discs to be set up between cuts, he was told that the DBI stacking system was magnetic, making separators

unnecessary. (Loeffel Dep., at 29). Loeffel also notes that the portion of the contract listing mechanical parts of the stacker does not mention separators. (*Pl.Resp.*, at ¶ 29a; *Pl.St.*, Ex. B, at 21). DBI, however, contends that throughout negotiations, through the time of the sale, it represented that it did not know if separators would be necessary on the Line. (*Defendant. Resp.*, ¶ 93; Savariego Dep., at 128). Mr. Savariego testified that all DBI represented was that they were attempting to design a machine that could run without separators, but were unsuccessful. (Savariego Dep., at 129). As a result, the Line was retrofitted with separators. (Savariego Dep., at 129; *Pl.St.*, ¶ 96).

Nevertheless, Loeffel contends that the steel sheets would still not consistently drop into the proper position (*Pl.St.*, ¶¶ 98, 100, 101-102), and that during operations producing three blanks, the stacker fails to operate properly. (*Pl.St.*, ¶ 105). Mr. Toczyl reported that, in multi-blanking mode, the Line could only run at 75 to 100 fpm to allow employees to clear jams associated with the shearing and stacking of blanks. (*Pl.St.*, ¶ 112; Ex. F, at 5-6). He also said he observed operators beginning at roughly 70 fpm and gradually increasing the line speed to 140 fpm, at which point the stacker usually malfunctioned. (*Pl.St.*, ¶ 113; Ex. F, at 5). DBI's response questions Mr. Toczyl's credentials and the reliability of his testimony, and the quality of Loeffel's steel. (*Def.Resp.*, ¶¶ 112, 113).

Mr. Salazar, the Loeffel operator, testified that the stacker becomes unreliable at speeds of approximately 140 fpm and, as a result, the speed of the Line must be closely monitored in order to achieve a "good stack." (*Pl.St.*, ¶¶ 107-109; Salazar Dep., at 16-17).

DBI questions his assessment of the speeds at which the Line can run smoothly, claiming his testimony was inconsistent. (Def.Resp., ¶ 107; Def.St. ¶ 46). In fact, Mr. Salazar also testified that, to get a good stack, the Loeffel employees would run the machine at speeds anywhere from 80 to 160 fpm. (Salazar Dep., at 31). He also allowed that "every job is different" and the quality of the steel affected the line speed the stacker could accommodate. (Salazar Dep., at 34). Loeffel contends that it has had stacker problems even when processing coils of prime steel, relying on Mr. Salazar's testimony. (Pl.St., ¶ 125). Mr. Salazar actually testified that Loeffel experienced stacking problems "with good coils that have no defects." (Salazar Dep., at 25). The definition of what constitutes "good" steel, however, is an issue in and of itself, as discussed later.[7]

According to Loeffel, the stacker cannot "alternate stack," which would allow Loeffel to have two stacking "bays." (Pl.St., ¶¶ 118-119). With two stacking bays, the Line could run to fill one bay while the other was removed and replaced. (Pl.St., ¶ 120). Loeffel explains that it cannot alternate stack because the sheets do not line up properly after the second or third box, creating uneven stacks. (Pl.St., ¶¶ 121-122). Mr. Freitag testified that this problem results in lost production time. (Pl.St., ¶ 123; Ex. I, at 18-19, 63, 86-87).

In addition to its arguments regarding secondary steel and its criticisms of Mr. Toczyl, DBI also cites faulty installation by Loeffel as a source of the stacker's problems. (Ex. G, DaClue Dep., at 14). Terry DaClue testified that the stacker was "out of level, out of square."

---

[7] In its response to this assertion, DBI directs the court to its statement of facts at "par. 34, FN 79." (Def.Resp., ¶ 125). Paragraph 34, however, includes no footnote 79.

He added that DBI employees corrected this problem. As Loeffel points out, however, there is no indication as to why the stacker was "out of level, out of square." (*Pl.Resp.*, ¶ 33a).

Beyond that, DBI attributes most of the problems with the stacker to the magnets it contracted Industrial Magnetics, Incorporated ("IMI") to produce. (*Defendant. Resp.*, ¶ 118, 122-123; *Def.St.* ¶ 33). Indeed, even Mr. Toczyl testified that the problem he observed might have been with the rollers or the magnets. (*Def.St.*, ¶ 42, Ex. M, at 169). Similarly, Mr. Barrons testified that any problems were attributable to computer problems, magnet problems, or material quality. (*Def.Resp.*, ¶ 112; *Def.St.*, ¶ 47). Mr. Savariego testified that testing revealed the magnets DBI purchased from IMI were defective. *Pl.St.*, ¶ 116; Ex. D, at 84). DBI retained an outside firm to test the magnets, which were custom-made by IMI. (*Def.St.* ¶ 45). The firm found the magnets defective, because their pulling force was not consistently even across the width of the stacker and provided only six to seven percent of the force specified in the contract between DBI and IMI. (*Def.St.* ¶ 45).

Walter Shear, the owner of IMI, testified that the only specifications DBI provided to IMI regarding the magnets was that the stacker would handle steel sheets from .018 to .08 inch thick. (*Pl.St.*, ¶ 128-129; Ex. L, at 152-153). He further testified that, as a result, the magnets IMI provided were not designed to handle sheets of thicknesses lesser or greater than .018 to .08 inch. (*Pl.St.*, ¶ 130; Ex. L, at 155). In response, DBI simply maintains that the magnets were tested and found to be defective. (*Def.Resp.*, ¶ 129; *Def.St.*, ¶ 45).

# II
# ANALYSIS

## A
## Summary Judgment Standards

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and ... demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party successfully carries this burden, the non-moving party must "go beyond the pleadings" and present specific facts which show that a genuine issue of material fact exists. *Id.* at 324. To demonstrate that the issue of fact is genuine, the opponent of the motion must do more "than simply show that there is some metaphysical doubt as to the material facts." *Matushita Electrical Industries, Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 578 (1986). "Speculation does not create a genuine issue of fact; instead it creates a false issue, the demolition of which is a primary goal of summary judgment." *Tyler v. Runyon*, 70 F.3d 458, 469 (7th Cir. 1995).

Indeed, the law is clear that when the purportedly undisputed facts show the unreasonableness of a "suggested inference" summary judgment is properly granted. *Hedberg v. Indiana Bell Telephone Co.*, 47 F.3d 928, 932 (7th Cir. 1995). "[C]onclusory allegations by the party opposing the motion cannot defeat the motion." *Mills v. First Federal*, 83 F.3d 833, 840 (7th Cir. 1996). Put another way, concrete facts cannot be

contradicted to defeat summary judgment with unsupported allegations and conclusions. *See* Rule 56(e), Federal Rules of Civil Procedure; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Liberty Lobby*, 477 U.S. at 255.

"Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970) (quoting the Advisory Committee Note on the 1963 Amendment to subdivision (e) of Rule 56 of the Federal Rules of Civil Procedure); *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994).

## B
## The Applicable Warranties Under the Agreement

We begin with the basic principle that when contract construction is at issue, the question whether contractual terms are ambiguous or not is a question of law, to be decided by the court. *Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1271 (7th Cir. 1996); *Houben v. Telular Corp.*, 231 F.3d 1066, 1072 (7th Cir. 2000). Equally basic is the principle that where language has a generally prevailing meaning, it is interpreted in accordance with that meaning. *Robbins v. Lynch*, 836 F.3d 370 (7th Cir. 1988). The Illinois Supreme Court has put it this way:

A contract's meaning must be determined from the words or language used, and a court cannot place a construction on the contract which is contrary to the plain and obvious meaning of the language.

*Johnstowne Centre Partnership v. Chin*, 99 Ill.2d 284, 458 N.E.2d 480, 481 (1983).

*Accord Bennett & Kahnweiler, Inc. v. American National Bank and Trust Company of Chicago*, 235 Ill. App. 3d 896, 601 N.E. 2d 810, 816 (1ˢᵗ Dist. 1972).

Of course, where a literal reading of even seemingly unambiguous terms will produce absurd results, at odds with the parties' intent as demonstrated by a reading of the contract as a whole, a literal interpretation will not be used. A literal reading of the word "guarantee" as used in §3.01, ¶17 of the contract does not yield absurd results; quite the contrary, it yields the only commercially sensible result and the only one consistent with the commonly understood meaning of the term.[8] DBI does not contend that either the word, "guarantee" or the other words in the guarantee clause are to be accorded a meaning other than that conveyed by the plain language of §3.01, ¶17. Thus, the doctrine of extrinsic ambiguity is not involved. *Bristow*, 41 F.3d at 351.

Both the text of §3.01, ¶17 and its placement in the contract leave no doubt of what was meant by the parties. The clause appears on page 27 of the contract, at the end of the 16, single-spaced paragraphs on pages 9-27, under the descriptive caption, "Equipment

---

[8] It is not even necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or even that he have a specific intention to make a warranty. In *Bodine Sewer, Inc. v. Eastern Illinois Precast, Inc.*, 143 Ill.App.3d 920, 926, 493 N.E.2d 705, 709 (4ᵗʰ Dist. 1986) (provision that "materials supplied would meet specifications called for in the project" created express warranty based upon those specifications).

Descriptions." Section 3.01 makes clear who is giving the guarantee and what is being guaranteed. Its unambiguous language provides:

> "DBI guarantees *this equipment* to operate mechanically within the *specifications and capacities as mentioned in this quotation* on a production basis." (Emphasis supplied).

The clause clearly states that the guarantee is of the equipment referred to in the immediately preceding, 18 single-spaced pages. And it is equally clear that the guaranteed "specifications and capacities" are those "mentioned in this quotation," and that they are to be applied "on a production basis." The "quotation" *is* the contract and consists of the first 29 pages and the 5 page Annex A, which is expressly made a part of the quotation as reflected on the face page of the contract and by virtue of the provision on page 6, which makes the Annex "an integral part of this agreement."[9]

The specifications and capacities are "mentioned" in various sections of the contract under the headings: Equipment Summary, Incoming Materials, Finished Productions, Production Analysis (Blanking), Slitting Specifications, and Production Analysis (Multi-Blanking). Some are also found in Mr. Savariego's letter of February 17, 2000, signed by him and by Mr. Loeffel and which appear in Annex A. Indeed, the February 17th letter has its own explicit guarantee "on Length/Width Tolerances – as per specification."[10]

---

[9] Even if the Annex had only been incorporated by reference, rather than being physically made a part of the agreement, it would be a component of the document. *Wilson v. Wilson*, 217 Ill.App.3d 844, 577 N.E. 2d 1323, 1329 (1st Dist. 1991).

[10] Among the agreements reflected in the Annex were that: (1) the Line will produce sheet
(continued...)

Under the UCC, "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty," 810 ILCS 5/2-313(2). These kinds of statements are generally deemed puffing. The "guarantee" cannot be dismissed, as DBI has attempted to do, as "puffing sales language," little better than an affirmation of the value of goods or a statement of its opinion or a commendation of the value of the Line. (*Def.Mem.*, at 17-20).

Puffery involves those sorts of generalized statements on which no reasonable person could rely. See *Corley v. Rosewood Care Center, Inc. of Peoria,* 388 F.3d 990, 1009 (7th Cir. 2004); *Weeks v. Samsung Heavy Industries Co., Ltd.,* 126 F.3d 926, 942 (7th Cir. 1997). They are often found in sales brochures and thus, not geared to the needs of a particular consumer. *Adolphson v. Gardner-Denver Co.,* 196 Ill.App.3d 396, 553 N.E.2d 793 (3rd Dist. 1990).[11]

---

[10](...continued)
quality and meet commercial tolerance by 4 times better than ASTM industry standards; (2) DBI will provide a five year warranty on equipment manufactured by DBI; and (3) the slitter tooling provided will be shimless tooling" (*Def.St.*, ¶ 15).

[11] In *Adolphson,* on which DBI exclusively relies, the plaintiff attended an industry convention at which he was told that the seller's new rig would drill twice as fast as the buyer's current rig. The buyer also obtained a brochure at the convention, which contained such representations as "the versatile [new rig] is machined strictly for profitable water well drilling" and was designed for "quick service and lower maintenance." Thereafter, the parties entered into a contract for the purchase of the rig. The contract expressly limited the warranties to those in the contract. The court held that the contract was a complete representation of the warranties between the parties and that neither the sales talk at the convention nor the brochure constituted a promise or description which became a basis of the bargain. 196 Ill.App.3d at 402-03, 553 N.E.2d at 798.

25

Puffery of course, is not limited to written materials and are often a material part of a sales pitch. Obvious examples are representations that a product is of high quality, the best money can buy, will satisfy every need, and so on. *Id.* There is perhaps a bit of puffery in the "Introduction" portion of the contract. For example, DBI says that Loeffel "will find a tremendous difference in favor of DBI" when comparing the production capacities of other "blanking – machines with DBI's." In referring to "Length Accuracy," the introduction boasts that "DBI Rotary Shear Lines can provide length accuracy never seen before." But that is where the puffery ends.

When one reads the next sections, "Equipment Summary" and "Equipment Descriptions," there are only factual, detailed, precise specifications relating to the particular piece of machinery being sold to Loeffel. Conspicuously absent are any generalized or unspecific evaluations of either the Line particularly or of DBI's product line generally. It is the particular machine being purchased that DBI "guarantee[d]" would "operate mechanically within the specifications and capacities as mentioned in this quotation on a production basis."

The concreteness and the clarity of the representations in §3.01, ¶17 fit perfectly within the UCC's definition of what constitutes a warranty: "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." 810 ILCS 5/2-313(1)(a). If it were to be concluded that there is a genuine issue

26

of fact about the meaning of §3.01, ¶17, in light of the UCC's definition and in light of the unambiguous language the parties chose in §3.01, ¶17, no provision in any contract could pass muster under the Code or could give the "stability to the present and certainty to the future" that contracts seek to achieve. *Farrington v. Tennessee*, 95 U.S. 679, 682 (1877). Contracts are not "parlor games, but the means of getting the world's work done," and their significant provisions are not to be dismissed as "'meaningless futilities'" – especially where, as here, they are between sophisticated business people and involve the very field of their sophistication. *Beanstalk Group, Inc. v. AM General, Corp.*, 283 F.3d 856, 860 (7th Cir. 2002)(Posner, J.).

In cases involving infinitely less specific promises, the Illinois courts have found there to be warranties. In *Felley v. Singleton*, 302 Ill.App.3d 248, 254, 705 N.E.2d 930, 934 (2nd Dist. 1999), the representation that a car was "in good mechanical condition" was enough. *Weng v. Allison*, 287 Ill.App.3d 535, 678 N.E.2d 1254 (3rd Dist. 1997), the representation was that the car was "mechanically sound," "in good condition," and had "no problems."

Perhaps Mr. Savariego thought that the "guarantee" clause really was nothing but puffery, although DBI has offered nothing to suggest that he accorded the words an idiosyncratic meaning. Apart from the inherent incredibility of such a position, and the inadmissibility of such testimony, had it been offered,[12] DBI is bound by the unambiguous language it selected or at least agreed to:

---

[12] *Cf. PMC, Inc. v. Sherwin Williams Co.*, 151 F.3d 610, 614 (7th Cir. 1998).

A signatory to a contract is bound by its ordinary meaning even if he gave it an idiosyncratic one; private intent counts only if it is conveyed to the other party and shared. [Citations omitted]. You can't escape contractual obligation by signing with your fingers crossed behind your back, even if that clearly shows your intent not to be bound. The parties are free to sign hortatory as well as binding documents; "intent" is important in the sense that if the parties agree on a hortatory instrument the court may not convert it into a different kind. This sense of "intent" denotes agreement between the parties and is not a license to allow undisclosed intent to dominate. Even statutes, widely said to follow the "intent of the legislature", draw meaning only from visible indicators such as their structure, the nature of the problem at hand, public statements (as in committee reports), Private intent is irrelevant. [Citation omitted]. So it is here. Lynch may have had a private intent, but the signs visible to the union all pointed to Lynch's acceptance of the collective bargaining agreement. Lynch is bound by its terms.

*Robbins v. Lynch,* 836 F.3d 330, 332 (7th Cir. 1988).

Ordinarily the question of whether a statement is a promise and was so understood by the plaintiff is a question of fact and so not resolvable in summary judgment proceedings. But "if it is clear that the question can be answered in only one way, there is no occasion to submit the question to a jury." *Garwood Packaging, Inc., v. Allen & Co., Inc.,* 378 F.3d 698, 705 (7th Cir. 2004). This is such a case. Concluding, however, that the guarantee clause means what it says, does not allow the granting of Loeffel's motion.

## C
## Genuine Issues of Material Fact Preclude Summary Judgment on the Breach of Warranty Claims

Express warranties are contractual in nature: the language of the warranty itself – the language of the contract – controls and dictates the obligations and rights of the various parties. *Hasek v. Daimler Chrysler Corp.,* 319 Ill.App.3d 780, 788, 745 N.E.2d 627, 634 (1st

28

Dist. 2001). Thus, under either a breach of contract or breach of express warranty theory, the question is whether the Line's performance lived up to the language of the contract, and whether that language contemplated Loeffel processing secondary steel. Similarly, under Illinois law, a product breaches an implied warranty of merchantability if it is "not fit for the ordinary purposes for which such goods are used." 810 ILCS 5/2-314(2)(c). "'A prima facie case that a product was defective and that the defect existed when it left the manufacturer's control is made by proof that in the absence of abnormal use or reasonable secondary causes the product failed "to perform in the manner reasonably to be expected in light of [its] nature and intended function."'" *Alvarez v. American Isuzu Motors*, 321 Ill.App.3d 696, 703, 749 N.E.2d 16, 23 (1st Dist. 2001) (*quoting Tweedy v. Wright Ford Sales, Inc.*, 64 Ill.2d 570, 574, 357 N.E.2d 449, 452 (1976)). As such, the machine's performance and the type of steel processed – the manner in which it was used – are dispositive.

Finally, under §2-315 of the UCC, when the seller has reason to know the buyer needs the goods for a particular purpose and knows the buyer is relying on the seller's skill in selecting the goods, an implied warranty of fitness for a particular purpose is inferred. *See* 810 ILCS 5/2-315 (West 1998); *Federal Ins. Co. v. Village of Westmont*, 271 Ill.App.3d 892, 897, 649 N.E.2d 986, 990 (2nd Dist. 1995); *Malawy v. Richards Mfg. Co.*, 150 Ill.App.3d 549, 558-59, 501 N.E.2d 376, 382-83 (5th Dist. 1986). The purpose of the machine – here, the processing of steel of varying qualities – is the central issue. Both the performance of the

Line and the type of steel the parties contemplated it would be processing, however, are genuine issues of fact that preclude the entry of summary judgment.

## 1
### Evidence Regarding Performance of the Line

To support its assessment of the Line's performance, Loeffel relies to a great extent on the report of its expert witness, Mr. Toczyl. (*Pl. Mem.*, at 6-8, 10, 12-14, 16-18). Of 60 paragraphs in Loeffel's statement of undisputed facts that qualify as addressing the performance of the line, over a third stem from Mr. Toczyl's expert report. (*Pl. St.*, 30-32, 43, 47, 50-51, 61, 66-69, 89, 95-97, 101-102, 112-113, 119-120, 127). Although the issue has not been raised by DBI, the unsworn report is not admissible under Rule 56(e). *See Wittmer v. Peters*, 87 F.3d 916, 917 (7th Cir. 1996)(Posner, J.), *cert. denied* 519 U.S. 1111 (1997); *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n. 26 (11th Cir. 2003); *Winstead v. Georgia Gulf Corp.*, 77 Fed.Appx. 267, 271 (5th Cir. 2003).

However, Mr. Toczyl's deposition testimony is part of the record and was previously reviewed in connection with the defendants' motion to bar his testimony. That testimony therefore, can properly be considered.[13] His testimony in essence is that the Line does not perform to specifications, and some of the problems are irremediable. There is also the testimony of Mr. Loeffel and his employees – Mr. Freitag, Mr. Ontiveros, and Mr. Salazar. The defendants, however, have their own version of why the Line failed to perform, if and

---

[13] Any "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," can be reviewed in a summary judgment proceeding. *Celotex*, 477 U.S. at 323.

when it did, supported by the testimony of Mr. Savariego and his employees. As such, consideration of the testimony necessitates credibility assessments and weighing of evidence that are inappropriate in the context of summary judgment. Where that is not the case, either the testimony of the Loeffel employees, or the testimony of the DBI representatives raises the question of the quality of steel the parties contemplated Loeffel would be processing through the Line. But that very issue is also not susceptible to summary adjudication.

## 2
### Primary or Secondary Steel

Whether DBI was aware of the type of steel Loeffel intended to process at the time of contracting continues to be a significant dispute. DBI maintains that the various specifications in the contract apply to the processing of primary, as opposed to secondary, steel. (*Def.Mem.*, at 28). Loeffel contends that the parties did not contemplate a limitation on the type of steel to be processed. Contracts do not exist in a vacuum; their terms must be understood in light of the commercial context in which they were drawn. *Archer-Daniels-Midland Co. v. Illinois Commerce Comm'n*, 184 Ill.2d 391, 400, 704 N.E.2d 387, 392 (1998); *Fleet Business Credit, LLC v. Enterasys Networks, Inc.*, 352 Ill.App.3d 456, 469, 816 N.E.2d 619, 629 (1st Dist. 2004).

The Loeffel/DBI contract does not provide the answer. There is no provision in the contract which addresses what kind of steel the Line was to run, or whether its stated performance specifications and capacities, which DBI guaranteed, were based on the kind of steel that Loeffel used. The terms primary and secondary steel, which figure prominently in

31

the summary judgment presentations – and even here, the parties disagree on their meaning – appear nowhere in the contract. The parties have conflicting versions of whether DBI knew that it would be using what DBI calls secondary steel. Summary judgment is thus improper. *Bourke v. Dun & Bradstreet Corp.*,159 F.3d 1032, 1037 (7th Cir. 1998); *N.W.I. Intern., Inc. v. Edgewood Bank*, 291 Ill.App.3d 247, 257, 684 N.E.2d 401, 408 (1st Dist. 1997).

A sampling of the parties' different versions on the issue of secondary versus primary steel demonstrates the need for a trial. It is undisputed that Loeffel processes both primary and secondary steel. At his deposition, Mr. Loeffel testified that less than half of Loeffel's business used "prime coils that would have been acquired from the mill with full warranty." (*Def.Resp.*, Ex. A, M.Loeffel Dep., at 14). His brother Tim, who is in charge of purchasing, testified that about 25 to 30% of Loeffel's business in 2002 involved prime coils. (*Def.Resp.*, Ex. B, T.Loeffel Dep., at 9). The distinction between the two types of steel is clearly one of quality, but the parties disagree as to whether it is relative or categorical. Loeffel suggests that whether steel is deemed "secondary" depends on the customer: one customer's secondary steel is another customer's primary steel. (*Pl.Resp.*, at ¶ 6a; M.Loeffel Dep., at 9-10). For example, Tim Loeffel testified that what a customer considers secondary quality steel can range from pre-painted coils all the way to steel with minor surface imperfections. (T.Loeffel Dep., at 9). DBI contends that secondary steel is scrap steel, painted steel, or rusted steel. (*Def.St.*, at ¶ 23; Ex. H, Savariego Dep., at 86, 135).

Mr. Mahtani testified that he was aware that Loeffel ran both primary and secondary coils, although he initially said he wasn't sure. (*Pl.Resp.*, at ¶ 8; Ex. 2 at 40, 94, 149-50). Mr. Savariego claimed that he did not find out until later that Loeffel ran secondary steel. (Savariego Dep., at 135). The evidence is anything but clear as to whether DBI knew the extent to which Loeffel ran secondary steel – whatever that means – or the extent it planned to use secondary steel on the Line. Moreover, since each party claims to have a differing understanding of what secondary steel is, summary adjudication is clearly inappropriate.

## III
## THE LOCAL RULE 56.1 FILINGS

Loeffel's reply in support of its motion objects to what it claims to be substantial non-compliance by DBI with the Local Rules relating to summary judgment filings. It has asked that in those instances of non-compliance, the facts be deemed admitted. (Reply at 2-4). Loeffel's difficulties with DBI's submission are not without some cause. When assessing a motion for summary judgment, a court relies upon LR 56.1 filings to determine the facts of the case. The Rule requires the party moving for summary judgment to file, among other items, a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." LR 56.1(a)(3). The required statement is to consist of short numbered paragraphs, including within each paragraph specific citations to the record supporting the facts set forth. *Id.*

LR 56.1(b)(3) then requires the opposing party to file among other items:

a concise response to the movant's statement that shall contain: (A) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and (B) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials.

LR 56.1(b) further provides that "all material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *Id.* The district court, with the approval of the Seventh Circuit, has long enforced the requirements of these rules. *Markham v. White*, 172 F.3d 486, 490 (7th Cir. 1999) (discussing Local General Rule 12, the predecessor to Rule 56.1). This means that a district court is entitled "to decide the motion based on the factual record outlined in the [LR 56.1] statements." *Koszola v. Board of Educ. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004).

In this case, the parties' submissions are not always compliant with the Rule's requirements. At times, both submissions failed to cite supporting evidence from the record or to provide portions of the depositions to which they refer. At other times they take an individual's deposition testimony out of context. Given the complexity of the submissions in this and in most cases, deviations from the Rule are inevitable. However, the difficulties in DBI's submission that have prompted Loeffel's objections are more pervasive and do make consideration of its submission more difficult.

All too often DBI's submission refers the reader from one paragraph to another and another before actually indicating the portion of the record upon which it relies. For example, in responding to a simple assertion such as Loeffel's paragraph 51 – "whenever line operators attempted to operate at speeds greater than 100 fpm the length tolerances were compromised" – DBI "incorporates its response to Nos. 30, 31, 47 and 52." (*Def.Resp.*, ¶ 51). At number 30, DBI further refers the court to its statement of facts at paragraphs 35-39. Its response to No. 31 sends the reader back to its statement of facts paragraphs 35-39, and to paragraphs 23-24. Curiously, DBI's response to No. 47 refers to responses 30 and 31 – which, again, leads a further step, back to statement of facts paragraphs 35-39 and 23-24. Finally, as its response to paragraph 52, DBI incorporates its response to paragraph 14. At the end of this labyrinth, there may be a response, but it is certainly not the "concise response" that LR 56.1 demands. Unfortunately, this course is followed in many parts of DBI's responses to Loeffel's statement of facts.[14]

My purpose is not to be critical of counsel in any way. I have discussed the issue because Loeffel's brief required a response and also to make clear that this kind of

---

[14] Another example of how non-compliance with LR 56.1 can frustrate analysis is DBI's response to Loeffel's paragraph 47 – "[o]nce the line begins running at 120 feet per minute in straight blanking mode (not multiple blanking), length tolerances of .005" are not achieved." Here is the response: DBI "incorporates" its responses to paragraphs 30 and 31. Paragraph 30 refers to paragraphs 35, 36 and 39 of its statement of additional facts. Paragraph 31, similarly, refers to paragraphs 35 through 39 and 23 and 24 of that statement. In the end, those paragraphs raise the issue of secondary steel and Mr. Toczyl's qualifications and the reliability of his testimony which are not issues for summary judgment. (*See also Def.Resp.*, ¶¶ 66-72). Recall that it was DBI who felt compelled to file a motion to strike *Loeffel's* rule 56.1 responses for failure to comply with the local rule.

presentation is not conducive to advancing a party's position. Judges have limited time to devote to any task, and there are always matters competing for attention. These limitations operate at every level of the system. *See* H. Hart, The Supreme Court, 1958 Term – Foreword: The Time Chart of the Justices, 73 Harv.L.Rev. 84 (1959); *Channell v. Citicorp National Services, Inc.*, 89 F.3d 379, 386 (7th Cir. 1996). Unnecessary obstacles to a court's efficient handling of a case should be avoided. It is especially true where the case is technically complicated as is this one. Nonetheless, as an exercise of discretion, the relief requested by Loeffel will be denied.

## CONCLUSION

The materials presented in support of and opposition to Loeffel's motion for partial summary judgment reveal significant clashes regarding virtually every material issue in the case. There persist genuine disputed issues of fact involving, among other things, what standards to apply to leveling, what shimless tooling is, what constitutes a "tooling exchange," and what type of steel the parties contemplated at the time the contract was executed Loeffel would be running on the Line. Depending on the deponent, the answer is prime steel, pristine steel, good steel, dry steel, oily steel, painted steel, rusted steel, or scrap steel. In short, based on the present record, resolution of this case demands a weighing of the evidence and an assessment of the credibility of the witnesses, neither of which are appropriate in the context of summary judgment.

For the foregoing reasons, Loeffel's motion for partial summary judgment is denied,

as is DBI's motion to strike.

ENTERED:_____

**DATE:** July 28, 2005          MAGISTRATE JUDGE