

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| LOEFFEL STEEL PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 01 C 9389 |
| | ) | Magistrate Judge |
| DELTA BRANDS, INC., d/b/a DBI; and | ) | Jeffrey Cole |
| SAMUEL F. SAVARIEGO, individually, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

On June 9, 2005, I denied the Defendants' Motion to Bar the testimony of Loeffel Steel Products' expert liability witness, Mr. Rudolph Toczyl. *See Loeffel Steel Products v. Delta Brands,* 2005 WL 1388076 (N.D.Ill. 2005). The history of the parties' dispute is discussed in that opinion and need not be repeated. I address here the plaintiff's motion to bar the testimony of the defendants' damages expert, Mr. Robert Dohmeyer and Dohmeyer Valuation Corporation ("DVC").

Like Gaul, Mr. Dohmeyer's expert opinion and report may be divided into three parts. The first is a "preliminary critique" of the report of Loeffel's damage expert, William Wiersema, contained in a letter dated February 27, 2004. The second and third components are contained in a separate, 41 (unnumbered) page document captioned, "Analysis of Economic Loss." ("the Analysis"). It, too, was dated February 27th.

The Analysis was a compendium of spreadsheets, reflecting 1) Mr. Dohmeyer's

calculations of the $248,000 economic loss he concluded was suffered by Loeffel, and 2) charts and graphs reflecting financial data for the period 1999 - 2002 for Loeffel and for eight, large, publicly traded companies, which were supposed to depict the economic conditions in the steel industry at that time.

Loeffel's present motion challenges Mr. Dohmeyer's qualifications to offer expert opinion on economic loss and his methodology and definition of economic loss, which Loeffel argues did not comply with the four, non-definitive factors that *Daubert* said a court could use in determining testimonial reliability. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Loeffel also contends that Mr. Dohmeyer should not be allowed to testify because of his unquestioning reliance on the defendants' theory that the deficiencies in the Line could be cured by the addition of extra workers and additional shifts.[1] Lastly, the motion contends that Mr. Dohmeyer should not be allowed to testify about Mr. Wiersema's damage analysis, because his critique of February 27, 2004 did not comply with Rule 26(a)(2)(B).

# I
# FACTUAL BACKGROUND

Prior to preparing his February 27th "preliminary critique" and his Analysis, Mr. Dohmeyer (and/or his two assistants at DVC) reviewed Loeffel's financial statements for the

---

[1] Literally every facet of this labor-added theory and every bit of information regarding alleviation of the Line's problems – as well as information regarding prior claimed fixes – came from the defendants' employees. (Dohmeyer Dep., at 26-39, 42-45, 55-57, 61-63, 109). The Line is the Rotary Shear Multi-blanking machine that Loeffel purchased from Delta Brands.

fiscal years ending November 30, 1999 through November 30, 2002, reviewed the deposition testimony of Loeffel's president, Maurice Loeffel and that of Mr. Wiersema, compiled financial data from annual 10k reports and Standard & Poor's Stock Reports on eight large publicly traded companies in what Mr. Dohmeyer categorized as the "(steel) metals industry," and interviewed the defendants' employees.[2] As we shall see, these interviews would play a pivotal role in Mr. Dohmeyer's analysis of Loeffel's "economic loss."

The Analysis concluded that Loeffel had damages prior to August of 2003 of $280,000, damages thereafter of $142,339, and lost profits of $50,000. The Analysis itself has no textual elaboration or explanation, and the reader is left to divine its meaning from the headings, captions, and the figures on its charts and spreadsheets. A meaningful understanding can only be gained by reference to Mr. Dohmeyer's deposition testimony. The Analysis's damage spreadsheets differentiated between pre- and post-August 2003 because, as Mr. Dohmeyer later explained, he assumed – based upon what he had been told by the defendants' employees – that the trouble with the magnets in the stacker had been alleviated or nearly so. (Dohmeyer Dep., at 39, 42-43). The Analysis then discounted the figures by $225,000, which represented the amount of the purchase price held back by Loeffel.

The Analysis's second and core assumption was provided by defendants' employees, who assured Mr. Dohmeyer that the various deficiencies in the Line could be offset by adding two additional workers to production runs and increasing the number of shifts. Using this

---

[2] Although its title suggested that a more comprehensive and edifying analysis was to come, the "preliminary critique" underwent not a single change.

3

methodology, and based on his conclusions about "industry" conditions between 1999 and 2002 – as reflected by the financial data of eight publicly traded companies -- Mr. Dohmeyer concluded that Loeffel's lost profits could not exceed $50,000.

The Analysis begins with an estimate of the hourly wages of the two additional workers, based upon the rates in Texas, where the defendants were located. Adjusting those rates – $13.00 for an operator and $7.50 for a helper – to what would be comparable in the Chicago area, Mr. Dohmeyer arrived at a total of $26.65 for both positions. Factoring in benefits left the combined rate at $39.98, which Mr. Dohmeyer arbitrarily increased to $50.00 per hour. Over the 702 days Loeffel ran the machine prior to August of 2003, based upon one eight-hour shift per day, Mr. Dohmeyer arrived at a maximum "economic loss" figure of $280,000, the amount that would compensate the two additional workers for the relevant period. (Analysis at 2; Dohmeyer Deposition at 26, 30, 33).

Mr. Dohmeyer then calculated future damages over a ten-year life of the Line, beginning in August of 2003. He began with the assumption, again based on what he was told by the defendants' employees, that Loeffel could process ten coils of steel on the Line every eight-hour shift. The "economic loss" figure was based on the defendants' assessment of the processing time. (Dohmeyer Deposition at 63-64). For this period, he was told by the defendants that an additional five minutes of labor per coil would alleviate any problems remaining with the Line during that period.[3] Once again this was based on the twin assumptions

---

[3] Each coil of steel weighs as much as 60,000 lbs.

4

that the problems with the stacker's magnets had been responsible for the vast majority of the deficiencies, and that these problems had been rectified by August, 2003. (Dohmeyer Dep., at 39, 42-43).

The five-minute estimate was a product of the defendants' assurances that the remaining problem – leveling the steel – could be corrected manually in 30 seconds to one minute per coil, which Mr. Dohmeyer rounded up to five minutes to be "conservative." (Dohmeyer Deposition at 62-63). This amounted to fifty minutes of labor per shift which he rounded up to an hour. This figure was then multiplied by 468 shifts per year over the ten-year period. Discounting the resulting sum to account for present value, cost of capital, and inflation, Mr. Dohmeyer arrived at $142,339 for future damages. (Analysis at unnumbered p. 3).

The lost profits calculations are a bit more difficult to discern, as the Analysis simply says under the captioned "Lost Business (Max)":

Lost Business (Economic Profits - August 2003 > .10 Gauge   $50,000
60" Inch Line Sold in February 2003

(Analysis at unnumbered page 5). The footnote after the $50,000 figure says "Expected Value of Economic Profits - Max - See Industry Analysis." However, referring to the 1½ page portion of the Analysis captioned "Industry Analysis" is a hopelessly uninformative exercise. All this part of the Analysis did was to summarize some unilluminating generalizations about the steel industry that Mr. Dohmeyer's DVC assistant had gotten off the internet.

At his deposition, Mr. Dohmeyer explained that the $50,000 figure was drawn from his analysis for processing "high gauge" steel or "toll processing." (Dohmeyer Dep., at 104, 106).

5

The problems processing "high gauge" steel or "toll processing" could not be corrected by additional labor – that business was lost. (Dohmeyer Dep., at 70-71, 102-104). Although it is unclear from the Analysis, this was apparently a new business that Loeffel hoped to get into by virtue of the Line, but could not due to the Line's shortcomings. (Dohmeyer Dep. at 106). In reaching the $50,000 figure, Mr. Dohmeyer also considered his review of Loeffel's performance between 1999 and 2002, as well as the performance of the eight publicly traded companies selected as the sampling against which Loeffel's prospects in that period were to be measured. (Analysis at unnumbered pp. 6-11; Dohmeyer Dep. at 116-128).

## II.
## THE ANALYTICAL FRAMEWORK FOR DETERMINING ADMISSIBILITY

*Loeffel Steel Products v. Delta Brands*, 2005 WL 1388076 (N.D.Ill. 2005) discussed the analytical backdrop of motions to bar the testimony of an expert, and that discussion is incorporated by reference. To it, the following should be added. The Supreme Court in *Daubert* stressed the trial judge's obligation to act as a gatekeeper to ensure that expert testimony is reliable. The insistence on reliability helps to ensure the integrity of the judicial process. *Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir. 1989). That goal is of such obvious and transcendent importance that judges can act *sua sponte* to prohibit testimony that does not pass muster under *Daubert*. *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1094 (7th Cir. 1994).

While *Daubert* reaffirmed the value of the adversary system generally and the capability of juries to understand scientific evidence and weigh the credibility of the competing experts,

with their often absolutist and clashing conclusions, it also made clear that in those cases in which the proponent of an expert could not demonstrate the reliability of the methodology employed by the expert, the court was required to disallow the testimony. The opportunity for vigorous cross examination and the presentation of contrary evidence – the traditional and appropriate means of attacking shaky but admissible evidence, *Daubert*, 509 U.S. at 596 – is not a basis for allowing otherwise inadmissible testimony to be admitted.

*Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999) reaffirmed the teachings of *Daubert*, but emphasized that the *Daubert* factors were not applicable, *semper ubique et ab omnibus*. They need only be considered when doing so will aid in the determination of the testimony's reliability. *Id.* at 142, 150. The inquiry is always, and of necessity, highly fact-specific, and no one factor, even when applicable, is outcome-determinative.

*Daubert* also cautioned judges assessing a proffer of expert testimony under Rule 702 to be mindful of other applicable rules, such as Rule 703, which permits an expert to base an opinion on information that need not itself be admissible, so long as it is the kind of information relied on by other experts in the field. 509 U.S. at 595.

## A
## Evaluation of Reliability of Mr. Dohmeyer's Testimony

### 1
### Qualifications of Mr. Dohmeyer and his Firm

Mr. Dohmeyer has a bachelor's degree in finance and is an accredited senior appraiser with the American Society of Appraisers ("ASA"). That accreditation was, according to Mr. Dohmeyer, the equivalent of a CPA for valuation and financial analysts. (Dohmeyer Dep., at

13).[4] He has lectured on the valuation of privately held businesses, and he has given expert testimony in 32 cases involving "economic loss." (*See* Analysis, Qualifications of Principal Appraisers). At his deposition, Mr. Dohmeyer testified that DVC was primarily in the business of appraising privately held businesses and analyzing economic loss, which, Mr. Dohmeyer conceded could include the loss of profits due to poorly manufactured products. Mr. Dohmeyer estimated that perhaps one in ten of the economic loss cases he had handled involved equipment that failed to perform as the seller had promised. (Dohmeyer Dep., at 8-12).

Mr. Dohmeyer was assisted in his analysis by Kevin Morrison and Sontwa Sinkala. Mr. Morrison has a bachelor's degree in business administration, accounting, and finance. Sontwa Sinkala has a master's degree in business administration, specializing in corporate finance, and a doctorate in economics and geography. Nonetheless, Loeffel contends that all three are unqualified to testify in this case since none is a certified public accountant, none has any expertise in the steel industry, none has experience in cases dealing with lost profits due to faulty machinery, and the USPAP guidelines were not followed in preparing the Analysis of Economic Loss. (Pl.Mem., at 6-9).

The argument that only a CPA with expertise in the steel industry – preferably, with regard to multi-blanking machines and a prior history of expert testimony in a case involving lost profits due to a poorly performing piece of machinery – is inconsistent with the liberal

---

[4] The requirements for accreditation are completion of five years' experience in business appraisals, passing three technical exams, an ethics and the Uniform Standards of Professional Appraisal Practice ("USPAP") exam, and the submission of two appraisals for evaluation. (Dohmeyer Dep., at 13).

approach to expert witness qualification taken by Rule 702. *See Holbrook v. Lykes Brothers Steam Ship*, 80 F.3d 777, 782 (3rd Cir. 1996); *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990). Overemphasis on qualifications over testimonial reliability reflects a pre-*Daubert* sensibility. *Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999).

Mr. Dohmeyer's and his colleagues' educational background and experience qualify Mr. Dohmeyer and his colleagues to testify about, at least, certain of the matters presented in this case. Characterizing them as "appraisers" does not advance analysis. Even appraisers can have sufficient expertise to rebut the testimony of certified public accountants in appropriate cases. *See, e.g., Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 186-87 (7th Cir.1993)(district court erred in precluding a real estate appraiser to rebut a CPA's opinion about real estate values in financial statement).

No case of which we are aware remotely suggests, let alone holds, that only a certified public accountant has the necessary expertise to testify about economic loss. In fact, being a certified public accountant does not ensure admissibility of testimony. *See e.g., Frymire-Brinati*, 2 F.3d at 186-87 (under *Daubert*, expert testimony of certified public accountant should not have been admitted); *S.E.C. v. Lipson,* 46 F.Supp.2d 758, 762 (N.D.Ill. 1999) (applying *Daubert* to bar testimony of certified public accountant on reliability grounds); *De Jager Construction, Inc. v. Schleininger*, 938 F.Supp. 446, 449-455 (W.D.Mich. 1996) (excluding certified public accountant expert opinion testimony that blurred the distinction between substantive liability and a calculation of damages); *Lithuanian Commerce Corp Ltd.*

9

v. *Sara Lee Hosiery*, 179 F.R.D. 450 (D.N.J. 1998) (excluding certified public accountant's damage calculations because they relied on speculative and unsupported assumptions).

In *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585 (7th Cir. 2000), the court rejected as unsound the notion that *Daubert* required particular credentials for an expert witness, finding that "anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Id.* at 591. Thus, Mr. Dohmeyer's admitted lack of specific experience with multi-blanking machines is not a disqualifying factor. *See Loeffel Steel Products v. Delta Brands*, 2005 WL 1388076 at *7.[5]

We turn then to the second prong of the inquiry, namely the reliability of the method that Mr. Dohmeyer and his associates employed to arrive at their damage figures.

## 2
## The Methodology Underlying The Analysis of Economic Loss

There are two aspects to Mr. Dohmeyer's methodology that trouble Loeffel. The first is Mr. Dohmeyer's use of a definition of "economic loss" that he devised, and the second is his reliance on the defendants' employees for the theory and supporting information that any deficiencies in the Line can be rectified by additional labor and extra shifts.

---

[5] *See also Maiz v. Virani*, 253 F.3d 641 (11th Cir. 2001) (allowing economist with no real estate development experience to testify about expected returns from real estate investment); *Quinton v. Farmland Industries*, 928 F.2d 335, 336 (10th Cir.1991) (veterinarian need not be a specialist in toxicology to testify on toxic effect of a substance on cows); *Ashland Oil, Inc. v. Delta Oil Prods. Corp.*, 685 F.2d 175, 178 (7th Cir. 1982), *cert. denied*, 460 U.S. 1081 (1983) (trial court properly relied on testimony of expert in chemistry despite lack of expertise in polyurethane chemistry).

## Mr. Dohmeyer's Definition Of Economic Loss

The Analysis defined "economic loss" as: "the dollar sum, exclusive of prejudgment interest and professional fees, required as payment in full necessary to make the damaged party equal on an economic basis." The definition, at least semantically, seems straightforward and consistent with the general Uniform Commercial Code ("UCC") and contract damage theory that the fundamental purpose of any damage award is to place the plaintiff in the position it would have been in had there been no breach, but not to place it in a better position or provide it with a windfall. *Platinum Technology, Inc. v. Federal Insurance Co.*, 282 F.3d 927, 932 (7th Cir. 2002).[6]

This apparent consonance was delusive, however, for Mr. Dohmeyer boasted in his deposition that "many years ago" he and his boss devised the definition: "this is *our* definition of what *we believe* the question is, what answer *we* are giving." (Dohmeyer Dep., at 19) (Emphasis supplied). If this definition of economic loss were faithful to basic damage theory, there would have been no need for Mr. Dohmeyer to have devised and employed his own definition. *Cf. Schenck v. United States*, 249 U.S. 47, 48 (1919)(Holmes, J.)("Of course the document would not have been sent unless it had been intended to have some effect. . . ."); *United States v. Ladish Malting Co.*, 135 F.3d 484, 490 (7th Cir. 1998)("The prosecutor must

---

[6] *Accord* 810 ILCS 5/2-106(1)(UCC remedies "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed."); *Dynamic Recycling Services, Inc. v. Shred Pax Corp.*, 210 Ill.App.3d 602, 615, 569 N.E.2d 570, 578 (1st Dist. 1991).

have thought that the instruction mattered; why else so vigorously oppose Ladish's request for an actual-knowledge instruction").

Mr. Dohmeyer's admissions about the origin and uniqueness of his definition – he conceded the definition was not to be found anywhere else (Dohmeyer Dep., at 18-19) – would seem to trigger the principle that the opinion of an expert need not be accepted when based on nothing more than personal opinion or belief instead of an understandable scientific basis. *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1360 (6th Cir.), *cert. denied* 506 U.S. 826 (1992); *Thomas v. FAG Bearings Corp.*, 846 F.Supp. 1382, 1393 (W.D.Mo. 1994). But this is only the beginning.

Mr. Dohmeyer's definition was the basis for a damage theory and calculation that is impermissible as a matter of law. It is not merely that the definition was not peer reviewed, not tested, and not generally accepted, as Loeffel correctly argues.[7] In addition, Mr. Dohmeyer's theory and methodology led him to exclude as a component of "economic loss" any amount attributable to the diminished value of the Line, itself.

Both contract law and the UCC provide the appropriate remedy for "economic loss"

---

[7] While *Daubert* applies to valuation testimony, whether offered by people like Mr. Dohmeyer, certified public accountants, or economists, *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183 (7th Cir. 1993), the *Daubert* factors are not to be rigidly applied in this or any other context. In some context, they may not be applicable at all or may have diminished utility as measures of reliability. *Loeffel Steel Products v. Delta Brands*, 2005 WL 1388076 at *6. Some courts have held they "do not conform easily to an analysis of economic theory." *Bailey v. Allgas, Inc.*, 148 F.Supp.2d 1222, 1235 (N.D.Ala. 2000). In determining the admissibility of expert testimony with respect to future lost profits, a trial judge has considerable leeway in determining the testimony's reliability. *ID Security Systems Canada, Inc. v. Checkpoint Systems, Inc.*, 249 F.Supp.2d 622, 690 (E.D.Pa. 2003).

occasioned by diminished commercial expectations, not coupled with injury to person or property. *See In re Chicago Flood Litigation*, 176 Ill.2d 179, 200, 680 N.E.2d 265, 275 (1997); *Mars, Inc. v. Heritage Builders of Effingham, Inc.*, 327 Ill.App.3d 346, 351, 763 N.E.2d 428, 434 (4th Dist. 2002).

"Generally speaking, a defective product can cause three types of injury: personal injury, property damage, and economic loss." *Trans State Airlines v. Pratt & Whitney Canada, Inc.*, 177 Ill.2d 21, 27, 682 N.E.2d 45, 48 (1997). In *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 82, 435 N.E.2d 443, 449 (1982), the Illinois Supreme Court held that "economic loss"

> "has been defined as 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits – without any claim of personal injury or damage to other property' (Note, Economic Loss in Products Liability Jurisprudence, 66 Colum. L.Rev. 917, 918 (1966)(economic loss)) *as well as 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'"*

91 Ill.2d at 82, 435 N.E.2d at 449 (Emphasis supplied)(Parentheses in original).

In their Response to Loeffel's motion, the defendants have "changed positions as nimbly as if dancing a quadrille." *Orloff v. Willoughby*, 345 U.S. 83, 87 (1953), for they now insist that Mr. Dohmeyer's definition is "entirely consistent" with traditional breach of contract damages theory, as expressed in *Moorman*. However, the Response ignores Mr. Dohmeyer's testimony in which he said that he created the definition years ago, and that it was to be found nowhere else. Nor does it attempt to explain why he would have insisted on using such a definition if it was consistent with the traditional and legal definition. (Response at 10).

In quoting from *Moorman*, the Response placed a period after the word "property," and ended the quote, thus conveying to the reader the impression that there was nothing further in the sentence. Omitted was the reference to the Columbia Law Review article and this critical phrase:

> "'. . . as well as 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'"

The UCC provides that "[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." 810 ILCS 5/2-714(2). In addition, a party may also recover incidental and consequential damages, 810 ILCS 5/2-715, including lost profits. *See Arcor, Inc. v. Textron, Inc.*, 960 F.2d 710, 713-14 (7th Cir. 1992) (buyer of a machine that failed to live up to its warranty was entitled to not only the difference between the value of the machine as warranted and its actual value, but lost profits as well); *Mercer v. Long Mfg., N.C., Inc.*, 665 F.2d 61, 69 (5th Cir. 1982) (in case involving faulty combine, economic loss consists of difference in value between combine as warranted and as received and any lost profits on crops resulting from inability to use combine for harvesting); *CogniTest Corp. v. Riverside Pub. Co.*, 107 F.3d 493, 496 (7th Cir. 1997).[8]

---

[8] In a lengthy "Declaration" belatedly submitted by the defendants in response to the present motion, Mr. Dohmeyer insisted that there is no authoritative text regarding the calculations of damages due to a machine that operates at a rate below its specifications. (*Defendant's Response to Plaintiff's Motion to Bar*, Ex. A, ¶19). The controlling legal definitions of economic loss and the measure of

(continued...)

The measure of damages under Loeffel's fraud claim (Count V) is the same. The victim of a fraudulent misrepresentation is entitled to recover as damages those losses caused by the misrepresentation, "including (a) the difference between the value of what he has received in the transaction, and its purchase price or other value given for it. . . ." Restatement (2d) Torts § 549 (1977). *Accord DiRose v. PK Management Corp.*, 691 F.2d 628 ,631 (2ⁿᵈ Cir. 1982); *FDIC v. Palmero*, 815 F.2d 1329, 1341 (10ᵗʰ Cir. 1987); *Four S Alliance Inc .v. American National Bank*, 104 Ill. App.3d 636, 432 N.E.2d 1213 (1ˢᵗ Dist. 1982); Dobbs, Remedies, § 9.2 at 594-95 (1973)("If a plaintiff has been induced to buy a house because of an intentional false representation that it is free from termites, the plaintiff is entitled to recover the difference between the value of the house as it actually exists and the value it would have had if it had not had termites. This rule puts him in the same financial position as if the fraudulent representations had been true.").

An examination of Mr. Dohmeyer's deposition testimony reveals the likely reason for the omission from the *Moorman* quotation. He testified that his assessment of economic loss necessarily omitted any consideration of the difference between the value of the Line as warranted and its diminished value resulting from the Line's flaws. He attempted to illustrate the point with the following hypotheticals.

> A: Well, if you paid – if you bargain to buy a machine for $10 and you allege once you got it you only paid nine because you hold back a dollar until it works right, but you say, hey, this machine doesn't work right; in fact, the damages on

---

[8](...continued)
damages available under Illinois law – which the defendants concede controls this case – would have been a starting point.

the machine the way it doesn't work are $2.00. So pay me the two. Well, he's going to go, I'm not going to pay you the two, I'll pay you one, because you already owe me one.

Q: Right. But couldn't I also take the position in your analogy that, hey, I paid you a million two hundred fifty thousand in the purchase price and a million five and the line I got isn't worth $100,000.

A: No, because you'd be double-counting . . . you can only get your damages.

(Dohmeyer Dep., at 133; see also *id.* at 134).

Mr. Dohmeyer's second hypothetical is even more convoluted. He posited a machine sold for four dollars that was warranted to print one dollar every year for five years. (Dohmeyer Dep., at 135). Then he continued:

A: All right. So it doesn't print – it doesn't even print the dollars for you. Okay? So you say, I want my $5.00, because the machine is defective, it didn't print money like you said it does. You want the machine back, too. That doesn't make any sense.

Q: I – I – what I'm saying is, I'm not disagreeing with your contention. There's no way I can say, hey, I have lost profits, and I can't say, I needed the machine to create the profits I lost. I understand this. What I'm saying is, you're – you're assuming in your analogy, that because we didn't pay the other two hundred and fifty grand, the machine must have been worth a a[sic] million two hundred and fifty, and that's the part I'm disagreeing with.

A: Absolutely, it's worth that because your damages get you whole to make it worth that.

By its selective misquotation, the Response allowed the defendants to argue that Mr. Dohmeyer's definition of economic loss was "consistent" with basic damage theory, without simultaneously revealing that it wasn't and without thereby revealing the unreliability of his methodology and his deposition testimony.

In his belatedly filed Declaration, Mr. Dohmeyer claimed what he had never claimed at his deposition, namely that his analysis of economic loss relied on a "benefit of the bargain theory," which he defined this way: "'But for' the defendant's allegedly defective machine, Loeffel would have had a faster machine, (one capable of producing at the rates provided in the contract specifications." (Parenthesis in original). Mr. Dohmeyer's newly claimed allegiance to the benefit of the bargain rule, is belied by and incompatible with his conclusion that diminution in value of a faulty piece of equipment and lost profits are mutually exclusive. The benefit of the bargain rule provides that the measure of damages is the difference between the actual value of what plaintiff received and its value had the representations been true. *See Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill.2d 179, 538 N.E.2d 530, 537-38, *cert. denied* 493 U.S. 894 (1989); *Out of Pocket or Benefit of the Bargain As Proper Rule of Damages for Fraudulent Representations Inducing Contract for the Transfer of Property*, 13 A.L.R. 3d 875 (1967)(collecting cases).

Expert opinions that are contrary to law are inadmissible. *Langehennig v. Sofamor, Inc.*, 1999 WL 1129683 at n.6 (D.Kan. 1999); *Bailey v. Allgas, Inc.*, 148 F.Supp.2d 1222, 1245-46 (N.D.Ala. 2000). They cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact. Indeed, "it is not an 'expert' opinion, but rather a personal opinion about what [damages Mr. Dohmeyer] believes should apply" in this case. *In re Diet Drugs Products Liability Litigation*, 2001 WL 454586 at *18 (E.D.Pa. 2001).

Whatever the motivation for the Response's misquotation or *Moorman*, it is deeply troubling. *Loeffel Steel Products*, 2005 WL 1388076 at *11 "There is more in membership

in the Bar than a license to sign a brief or intone a prosy argument." Cardozo, Law and

Literature, 145-46 (1931). Justice is not a game, and zealous advocacy does not entitle a

lawyer to "'hoodwink a judge [or an opponent] who is not overwise.'" *United States v. Paglia*,

190 F.2d 445, 448 (2nd Cir. 1951)(L. Hand, J.).[9]

### b
### The Reliability Of Mr. Dohmeyer's "Labor-Added" Methodology

Mr. Dohmeyer's damage model and calculation of economic loss suffer from the further

flaw that they violate of Rule 703 of the Federal Rules of Evidence.[10]

Mr. Dohmeyer's calculation of economic loss is based on the assumption that the

addition of extra labor and shifts would allow the Line to yield the same productivity as it would

---

[9] A similar kind of manipulation is found in the defendants' rendition of *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183 (7th Cir. 1993). The discussion in the Response brief makes it appear as though the plaintiff's expert, a real estate appraiser, was improperly forbidden to testify that the plaintiff's expert, a certified public accountant, "bungled" his "valuation of damages." (Response at 16). "Similar[ly]," the defendants say, they proffer "Mr. Dohmeyer, an economist, as its expert." *Id.* Mr. Dohmeyer isn't an economist, and the two cases are not similar. In *Brinati*, the chairman of the real estate committee of the American Institute of Certified Public Accountants, *not* the appraiser, testified that the plaintiff's CPA had "bungled" by using historical rather than projected future income in his cash flow analysis. 2 F.3d at 187. It was in an effort to "move from theory to concrete valuation" that the appraiser was to testify thereafter about the accuracy of property values in the financial statements.

[10] Rule 703 provides:
Bases of Opinion Testimony by Experts
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissable shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

have running at faster speeds with fewer shifts. The theory and the precise number of additional workers and shifts needed came from the defendants' employees, on whom Mr. Dohmeyer uncritically relied. It is undisputed that neither Mr. Dohmeyer nor his assistants at DVC had any expertise in blanking machines and were incapable of assessing the validity of the information provided by the defendants. (Dohmeyer deposition at 26, 33-38, 89). *Cf. Bailey v. Allgas*, 148 F.Supp.2d 1222, 1240 (N.D.Ala. 2000)(unquestioning reliance on opinions expressed by plaintiff's counsel not proper).

Proceeding from this "unquestioning reliance," *Gentieu v. Tony Stone Images/Chicago, Inc.*, 214 F.Supp.2d 849, 853 (N.D.Ill. 2002)(Shadur, J.), Mr. Dohmeyer calculated the amount it would cost Loeffel to pay the additional workers in order to produce as much finished steel as would have been produced had the Line operated properly. Mr. Dohmeyer's difficulty in explaining how the additional workers would cure the situation demonstrates dramatically that he brought no expertise to bear on the underlying assumptions on which his economic loss theory was based:

> Sure, just by having, you know, the kinds of things, you know – you have to, I guess, re – recalibrate the machine every time you put a new roll on it where it should have been automatic, you can have a guy standing there, you know, doing that kind of thing. You know, once again, I don't know the technical parts of it, and I understood them a lot better when I did the interview and when I prepared for this deposition last time, but I haven't gone back to re-talk to them about those specifics again for today's deposition . . . . (Dohmeyer Dep. at 37).

Yet, Rule 703's relaxation of the usual requirement of firsthand knowledge – a rule which represents a pervasive manifestation of the common law's insistence upon the most reliable sources of information – was premised on an assumption that the expert's opinion will

have a reliable basis in the knowledge and experience of his discipline. *Daubert*, 509 U.S. at 592. When pressed, Mr. Dohmeyer could not even say whether the additional labor would solve the alleged problems and raise the level of production. For that information, one would, he said, have to check with Messrs. Barron, King and DaClue. (*Id.* at 37-38, 45, 89). Referring to his damage figure, he said:

> [A]ll it really assumes is with the addition of this expense. And it would probably be labor, you know. . . It says with this much money thrown at the problem, probably – probably, in terms of labor, you can solve the production problems that are alleged. (Dohmeyer Dep. at 44-45).

It is no answer to say that since Rule 703 allows an expert to base an opinion on inadmissible evidence, Mr. Dohmeyer must be allowed to testify, even though the basis of the information on which he relied came from the defendants. First, the defendants have made no effort to carry their burden of proving by a preponderance of the evidence that the kind of information given to Mr. Dohmeyer is the kind "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. . . ." The argument is thus forfeited. *United States v. Baretz*, 41 F.3d 867 (7th Cir. 2005).

Second, and more importantly, while Rule 703 was intended to liberalize the rules relating to expert testimony, it was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion. *See, e.g., Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002); *TK-7 Corp. v. The Estate of Barbouti*, 993 F.2d 722, 731-34 (10th Cir. 1993); *In re: James*

*Wilson Associates*, 965 F.2d 160, 173 (7th Cir. 1992).

Under Rule 703, an expert may rely on hearsay in formulating his opinion – provided the requirements of Rule 702 are met – but the evidence is not admissible for the truth of the matters asserted. *United States v. Gonzales*, 307 F.3d 906, 910 (9th Cir. 2002); *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 734 (10th Cir. 1993)("'the hearsay is admitted for the limited purpose of informing the jury of the basis of the expert's opinion and not for proving the truth of the matter asserted.'"). *Cf. Gregory v. Oliver*, 2002 WL 31972165 at *3 (N.D.Ill. Dec. 27, 2002)(Shadur, J.).

Rule 703 was never intended to allow oblique evasions of the hearsay rule. In *Dura Automotive*, the Seventh Circuit acknowledged that it "is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." 285 F.3d at 613. For example, as the Committee Notes to the 1972 Proposed Rule 703 observed, a physician, though not an expert in radiology, may rely for a diagnosis on an x-ray. *Id.* The Seventh Circuit extrapolated from there to make its point:

> We too do not believe that the leader of a clinical medical team must be qualified as an expert in every individual discipline encompassed by the team in order to testify as to the team's conclusions. But suppose the soundness of the underlying expert judgment is in issue. Suppose a thoracic surgeon gave expert evidence in a medical malpractice case that the plaintiff's decedent had died because the defendant, a radiologist, had negligently failed to diagnose the decedent's lung cancer until it was too advanced for surgery. The surgeon would be competent to testify that the cancer was too advanced for surgery, but in offering the additional and critical judgment that the radiologist should have discovered the cancer sooner he would be, at best, just parroting the opinion of an expert in radiology competent to testify that the defendant had x-rayed the

decedent carelessly.

*Id.* The problem, then, is that the expert is vouching for the truth of what another expert told him – he is merely that expert's spokesman. But, "[a] scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science." *Id.* at 614. *See also Grant v. Chemrex, Inc.*, No. 93 C 0350, 1997 WL 223071, *8 (N.D.Ill. Apr. 28, 1997) (expert's "professional knowledge and ability" were not adequate to evaluate calculations and opinions upon which he based his opinion).[11]

That is precisely the situation here: If allowed to testify, Mr. Dohmeyer would be "hid[ing] behind" Messrs. Barron, King and DaClue and acting as their "mouthpiece." *Id.* at 615. He would, in effect, be vouching for their labor-added methodology, when he has absolutely no knowledge of whether the theory is valid and reliable. *See also TK-7 Corp.*, 993 F.2d 722. Thus, Mr. Dohmeyer's testimony cannot be used to prove that additional labor and shifts were in fact the medicament for the Line's ills. *In re James Wilson Associates*, 965 F.2d 160, 173 (7th Cir. 1992)(Posner, J.)

The example posed by Judge Posner in *James Wilson Associates* demonstrates the problem with Mr. Dohmeyer's testimony:

_____

[11] By way of example, the court in *Dura Automotive* said that a theoretical economist, who relied on the findings of an econometric study conducted by another economist, would not be allowed to testify if he lacked expertise in econometrics, and the study raised questions that only an econometrician could answer. 285 F.2d at 614. Even Judge Wood, who dissented, agreed with this example. *Id.* at 620. *See also TK-7 Corp.*, 993 F.2d at 732 (the rationale of Rule 703 "is certainly not satisfied in this case where the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction.").

22

> "If, for example, the expert witness (call him A) bases his opinion in part on a fact (call it X) that the parties lawyer told him, the lawyer cannot, in closing argument, tell the jury, 'see we proved X through our expert witness, A.'"

*Id.* at 173. (Parenthesis in original).

This was the kind of hand-off attempted in *James Wilson Associates*, where an architect attempted to testify to the value of a building based upon a report provided to him by a consulting engineer, who had examined the building. The Seventh Circuit held that the trial judge "was entitled to exclude the architect's evidence as hearsay." *Id.* at 172. The issue was the state of the building, and the expert who had evaluated that state – the consulting engineer – was the one who should have testified. The architect could use what the engineer told him to offer an opinion *within the architect's domain of expertise*, but he could not testify for the purpose of vouching for the truth of what the engineer told him – "of becoming in short the engineer's spokesman." *Id.* at 173. It "is improper to use an expert witness as a screen against cross-examination (though the other side could always call him as an adverse witness, and cross-examine him)." *Id.* (Parenthesis in original).

Yet, without the testimony of Messrs. Barron, King and DaClue explaining and justifying their labor-added theory, Mr. Dohmeyer's testimony will "rest[ ] on air." *Dura Automotive*, 285 F.3d at 615. If the underlying assumptions cannot be proven by admissible, competent evidence, the very nature of which would appear to require expert testimony, Mr. Dohmeyer's analysis of economic loss would have no evidentiary support and would be irrelevant. *See* Rule 402, Federal Rules of Evidence. Yet, the only expert disclosure in the case on the defendants'

side is Mr. Dohmeyer's. Messrs. Barron, King and DaClue have not been designated as experts. Hence, it would appear that Mr. Dohmeyer's testimony, even if initially allowed, would ultimately have to be stricken.

The instant case is analytically congruent with *Dura Automotive*. There, the court held that the expert could have testified that the well field was contaminated by volatile organic compounds and that *if* the defendant's plastics plant was within the well field's capture zone, some of the contamination may have come from that plant. It did not follow, however, that he could testify that the plant *was* within the well field's capture zone. 285 F.3d at 613-614.

The defendant moved to bar the hydrogeologist's testimony and to dismiss Dura's claim. Dura responded with affidavits from the four employees who had prepared the models on which the hydrogeologist was basing his conclusions. The defendant moved to strike the affidavits on the ground that the disclosure of additional expert witness was untimely. The district court granted the motion and held that without the affidavits, there was insufficient evidence of the reliability of the models, and the hydrogeologist's testimony could not prove that accuracy. The court barred the testimony and concluded that without it, Dura had no case. 285 F.3d at 612.

The Court of Appeals affirmed. It held that to the extent the affidavits contained evidence that would have to be presented at trial by an expert witness or witnesses other than the hydrogeologist in order for Dura to withstand a motion of judgment as a matter of law, Dura's failure to have made timely disclosure of their experts' opinions invited application of Rule 37(c)(1) to bar the authors of the affidavits (or any other expert for that matter) from testifying. In the instant case, denying the motion to prohibit Mr. Dohmeyer's testimony and

allowing him to testify when there will be no competent evidence to prove the truth of the underlying assumptions would result in allowing testimony that would have to be stricken as irrelevant. The law never requires an idle thing to be done. *Brooklyn Life Insurance Co. v. Dutcher*, 95 U.S. 269, 272 (1877).

*TK-7 Corp. v. Estate of Barbouti* is also instructive.[12] To support the plaintiff's claim and to calculate the amount of damages, the plaintiffs presented testimony from Dr. Boswell, a financial economist and professor of finance. Dr. Boswell predicated his calculations of lost profits on sales projections of one Werber. The district court initially allowed the testimony, but ultimately directed a verdict against the plaintiff, based on insufficiency of the evidence of damages. Mr. Werber was not called to testify, and the district court held that in order to prevail, the plaintiff had to present affirmative evidence on the projections that Dr. Boswell had assumed to be true. *Accord International Adhesive Coating Co. v. Bolton Emerson International*, 851 F.2d at 546. Since there was no such evidence, the plaintiff failed to carry its burden of proof. In affirming, the Tenth Circuit pointed out that Dr. Boswell had no familiarity with methods or reasoning used by Mr. Werber in arriving at his projections. In the instant case, Mr. Dohmeyer conceded a similar lack of understanding or familiarity of the models crafted by Messrs. Barron, King and DaClue.

c
### The Unreliability of The Methodology Underlying Mr. Dohmeyer's Conclusions Regarding Loeffel's Claim For Future Lost Profits And Business

The third aspect of Mr. Dohmeyer's proposed expert testimony focuses on the Loeffel's

---

[12] *Barbouti* was cited approvingly in *Dura Automotive*. 285 F.3d at 613.

claim for lost profits and business resulting from deficiencies in the Line. The Analysis of Economic Loss was accompanied by a letter of transmittal containing a 1½ page discussion of the "(steel) metals industry," under the caption, "Industry Discussion." (Parenthesis in original). It summarized isolated bits of information that Mr. Dohmeyer or one of his colleagues had read on "money.msn.com and cnnfn.com." (*See* letter of February 27, 2004). As one would expect given Mr. Dohmeyer's admitted lack of expertise in the steel/metals industry and the sources of the information on which he relied, the 1½ page discussion is superficial, generalized, and inexpert.

The discussion began by noting that the steel industry is made up of three tiers: primary metals producers, metals processors and/or service centers, and end users. The primary producers are the source of steel for the service centers, which "undertake value-adding services such as precision design and other pre-production processing as may be required by specific customers." These service centers, according to DVC, were formerly mostly distribution centers performing little processing. By the 1980s, however, they began to add processing capabilities that allowed them to add a broad range of value-added services.

Concurrently, the primary metals producers began concentrating on high volume production. As these industry changes continued, the discussion explained, many service centers found themselves unable to obtain processed products and had to begin outsourcing their customized metal processing to service centers with value-added capabilities. Recent challenges in the industry include the recession and frequent, unpredictable increases in domestic steel prices.

The Analysis of Economic Loss contained 12 pages of graphs and charts reflecting financial data about 8 companies: A.M. Castle & Co.; Friedman Industries Inc.; Gibraltar Steel Corp.; Olympic Steel Inc.; Reliance Steel & Aluminum Co.; Ryerson Tull, Inc.; Steel Technologies Inc.; and Worthington Industries, Inc. The information was obtained from 10k's and Standard & Poor's reports. Mr. Dohmeyer could not explain how the companies were selected for inclusion in the sampling. This is the best he could say:

> I *think* one of the guys did a search on *one* company that was – that had a *similar description* to the description for this kind of business, what they do.

(Dohmeyer's Dep. at 121)(Emphasis supplied). How the other seven were selected remains unexplained.

The charts reflected the total sales, gross profit margins, net income, equity, return on equity, stock price, book value, and market to book value of the 8 companies for the period 1999 - 2002. According to Mr. Dohmeyer, the financial history of the eight companies during that period was relevant in evaluating Loeffel's potential for acquiring new business with the Line. (Dohmeyer Dep., at 119-121). But what that new business was to be, Mr. Dohmeyer wasn't sure. He referred to it, variously, as "toll processing, [] heavier gauge or wider gauge or both, I don't know." (Dohmeyer Dep., at 126). Whatever it was to be, Mr. Dohmeyer explained, its net present value was a function of the competitive environment of the "industry," as reflected by the eight corporations that been chosen. (Dohmeyer Dep., at 126).

He testified that since the 8 companies had experienced financial difficulties between 1999 and 2002, Loeffel could not have hoped to do any better. (Dohmeyer Dep., at 120-122).

The figures showed, among other things, *declines* in median total sales for the 8 companies from 2001 to 2002. But Loeffel had a 5.3% *increase* in 2002, while the 8 companies had a median loss of 2.2%. Similarly, while the median *decline* from 2000 to 2001 in gross profit margins of the 8 companies was 5.8%, Loeffel had a 1.4% *increase*. From 2001 to 2002, there was a median increase in gross profit margin of the 8 companies of 6.7%, while Loeffel's increased 23.9%.

In order for the sampling chosen by DVC comparison to have the requisite predictive capacity and the reliability *Daubert* demands, Mr. Dohmeyer had to "select samples that are truly comparable. To put it another way, care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'" *Donnelly v. Rhode Island Board of Governors for Higher Education,* 929 F.Supp 583, 591 (D.R.I. 1996).

In calculating lost future profits or lost business, the measure of damages is guided by analysis of "comparable businesses *in the area.*" *Cates v. Morgan Portable Bldg. Corp.*, 591 F.2d 17, 21 n.7 (7th Cir. 1979)(Emphasis supplied). "[T]he business used as a standard must be as nearly identical to the plaintiff's as possible." *Lehrman v. Gulf Oil*, 500 F.2d 659, 667 (5th Cir. 1974), *cert. denied,* 420 U.S. 929 (1975). *Accord In re James O'Connell Co. Inc.,* 799 F.2d 1258, 1269 (9th Cir. 1986); *National Farmers Organization, Inc. v. Associated Milk Producers, Inc.*, 850 F.2d 1286, 1292 (8th Cir. 1989). This is often referred to as the "yardstick approach." Absent the requisite showing of comparability, a damage model that predicts either the presence or absence of future profits is impermissibly speculative and conjectural. *Cf. Home Placement Svc., Inc. v. The Providence Journal Co.*, 819 F.2d 1199, 1209 (1st Cir.

28

1987); ABA Section of Antitrust Law, Antitrust Law Developments, 877-879 (5th ed. 2002)(and cases cited).

Of course, exact correlation is not necessary but the samples must be fair congeners. If they are not, the comparison is manifestly unreliable and cannot "'logically advance[ ] a material aspect of the proposing party's case. The Supreme Court [in *Daubert*] referred to this second prong of the analysis as the fit requirement.'" *Loeffel Steel Products v. Delta Brands*, 2005 WL 1388076 at *16 (*quoting* Judge Kozinski's opinion on remand from the Supreme Court . *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir.), *cert. denied*, 516 U.S. 869 (1995)).

Undiscriminatingly labeling all nine companies "steel service centers," Mr. Dohmeyer tacitly assumed that they are necessarily monolithic, that they necessarily compete for the same customers, and thus the past financial profile of the eight is a reasonable predictor of how Loeffel would have performed. Stated more simply, Mr. Dohmeyer's argument runs this way: 1) Loeffel and the eight companies are in the same "industry;" 2) all participants in "an industry" are necessarily competitors; 3) therefore, the financial performance of the eight companies in 1999-2002 is relevant to determining Loeffel's prospect for new business had the Line performed properly.[13] (Dohmeyer Dep., at 124). Here as always, "[w]e must think things, not

---

[13] When asked at his deposition how, since he knew nothing about the customer base of Loeffel or the eight publicly traded companies, he could have concluded that Loeffel served the same customer market as the eight other service centers, Mr. Dohmeyer said:

Oh they have to. I mean it's – you're in that industry, you're competing. You can't help – once you're in an industry, you can't help but compete with other people in your industry. (Dohmeyer Dep., at 124).

29

words, or at least we must constantly translate our words into facts for which they stand, if we are to keep to the real and the true." Holmes, Law In Science and Science In Law, 12 Harv.L.Rev. 443, 460 (1889).

Mr. Dohmeyer's inexpert conclusion that each participant in "an industry" necessarily competes with every other participant in the industry is demonstrably false, as Dohmeyer's own report shows. He claimed that the "steels/metals industry" was comprised of three tiers. But as his report noted, the three categories of industry participants were not competitors, but enjoyed a symbiotic relationship. Bentleys and Kias are in the same "industry," but obviously don't compete for the same customers. Arnold Schwarzenegger and Anthony Hopkins never competed for the same roles, although they were both in the "movie industry."

Of course, these are matters of public knowledge. The inquiry becomes more difficult, when the "industry" is more complicated and less obvious. Perhaps, all "steel service centers" do compete; perhaps they don't, or perhaps they do only to an exceedingly limited degree, measured by the extent of the products and services they offer in common, and their geographic location. But only an expert in the field is qualified to say, and neither Mr. Dohmeyer nor his colleagues even begin to qualify. *Cf. Gentieu*, 214 F.Supp.2d at 851. (What controls the admissibility of an expert's opinion evidence, "depends on whether his claimed expertise qualifies him to opine on the specific matters that he seeks to address.").

A moment's reflection demonstrates the error in Mr. Dohmeyer's facile, and under-inclusive methodology. Suppose the eight companies selected by DVC had, as does Loeffel, blanking operations, but, in addition, offered a very large number of other diversified products

and services, not offered by Loeffel. Assume further that unlike Loeffel with its localized customer base in the Midwest, the eight companies had nationwide or worldwide operations. In that event, the companies could scarcely be said to be comparable, and comparing their undifferentiated sales and income figures to those of Loeffel, would prove absolutely nothing. *Cf. Bailey v. Allgas, Inc.*, 148 F.Supp.2d 1222, 1232 (N.D.Ala. 2000).[14]

Mr. Dohmeyer at his deposition admitted he knew nothing about the respective geographic or product markets or customer bases of the eight companies or of the quality of service or any other relevant factor that would bear upon the question of comparability. *See Home Placement Svc., Inc. v. The Providence Journal Co.*, 819 F.2d 1199, 1206 (1st Cir. 1987). And the charts he compiled do not break out financial data by product or services. Hence, the raw financial data does not tell anything about the performance of the eight companies as to those products and services that they had in common with Loeffel. And it is only with respect to those products that they would be competitors -- at least for the purposes relevant to this case.

Even in cases involving far more comparability than is apparent here, courts have refused to allow the seemingly comparable companies to be used as a yardstick. In *Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc.*, 213 F.3d 198 (5th Cir. 2000), the plaintiff owned

---

[14] In antitrust cases, proof of the relevant product and geographic market is absolutely essential. The relevant geographic market is generally defined as the area of effective competition, that is the area in which the product or its reasonably interchangeable substitutes are traded. A determination of the geographic market must entail an analysis of several factors including the location of competitors and price data. *Id.* Although this case presents different issues, for purposes of determining comparability, the analysis is much the same.

indoor soccer arenas. The court rejected soccer arenas in general as comparable businesses where there was no evidence offered regarding geographical location, size or attractiveness of those facilities, the size and type of the market that they served, the relative costs of operation, the amounts charged, or the number years the facility was run. Id. at 208. The Fifth Circuit stressed that employing such a broad category was like "arguing that because McDonald's franchises earn a certain average rate of return, a particular franchise will perform to the average." Id. at 208-09. *See also, Kinesoft Development Corp. v. Softbank Holdings Inc.*, 139 F.Supp.2d 869, 910 (N.D.Ill. 2001) (rejecting damages calculation where expert gave no consideration to any analysis of a comparable company selling comparable products).

It cannot be too often repeated or too strongly emphasized that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Kumho Tire*, 526 U.S. at 157. That caution applies with singular force to Mr. Dohmeyer's conclusion that the eight publicly traded companies were comparable to Loeffel for purposes of assessing lost future business and profits.

Mr. Dohmeyer lacked the qualifications to conclude that merely because all nine companies could be classified as "service centers," they necessarily competed with Loeffel or that they were comparable. Spending a few minutes on the internet does not make one an expert on any "industry" or on any topic. *Cf Charter National Bank & Trust v. Charter One Financial, Inc.*, 2001 WL 1035721 at *6 (N.D.Ill. September 4, 2001)(assistant professor of

law at the University of Chicago and a fellow in economics and public policy was not qualified as an expert on trademark law despite his extensive reading of trademark cases).[15]

The eight congeners selected by DVC were large to massive, publicly traded companies. According to Mr. Dohmeyer's charts, their average *median* total sales for the period 1999 - 2002 was $640 million, while Loeffel's was $19 million.[16] Perhaps this alone is not enough to tip the balance. But, what does is Mr. Dohmeyer's inexplicable failure to have considered such critical factors as what services the companies provided, their customer base, the products they sold, the geographic markets in which they operated, their prices and other critical aspects of the businesses. In fact, Mr. Dohmeyer admitted at his deposition that neither he nor his colleagues researched Loeffel or the eight comparative companies' customer bases. Yet, unless Loeffel's customer base and the services and products it offered approximated those of the eight companies, they were not "comparable," and the latters' economic fortunes would not be a "reliable" predictor of how Loeffel would have fared in the period 1999-2002.

The internet reveals the manifest unreliability of Mr. Dohmeyer's assumption about the uniformity of steel service centers – an assumption that is the lynchpin in his theory of

---

[15] The defendants have taken a somewhat inconsistent position on the question of Mr. Dohmeyer's expertise in the steel industry. First, they say that that expertise is "inconsequential." (Response at 9). Then, as an afterthought, they say that Mr. Dohmeyer "perform[ed] thorough research on the steel industry." Of course he did no such thing and saying it doesn't make it so. Finally, they say he consulted with the defendants' personnel, who have extensive experience in the steel industry. *Id.* There is nothing to support the claim that the defendants' employees are experts, and Mr. Dohmeyer never claimed that they imparted information beyond their labor-added theory. In any event, even if they had, that would not begin to satisfy the requirements of Rule 702 or 703.

[16] In 2002, the actual sales for the eight companies ranged from $99 million to $2.296 billion. There was a similar range in gross profit margins ranging from a low of 6% to a high of 29.8% in 2002.

comparability. It also reveals the "fundamentally unsound basis [and] fatally deficient amount of data" on which Mr. Dohmeyer based his conclusion that the eight companies and Loeffel were comparable. *Thomas v. FAG Bearings Corp.*, 846 F.Supp. 1382 (W.D.Mo. 1994).[17]

Even a cursory search reveals that steel service centers are *not* monolithic and offer an extraordinary array of services and products, most of which are not offered by Loeffel, but are offered by the eight companies DVC selected.

In addition to cutting and slitting, coil processing, decoiling, bending, (and perhaps blade decambering) – the services offered by Loeffel – service centers also offer many services that Loeffel does not, such as: polishing, plasma profiling, grinding, gun drilling, tempering, stress relieving, annealing, heat treating, burning, abrasive and carbide blade sawing, computerized plasma cutting and automatic splice welding, piercing, notching, edging, ribbon and oscillate winding, punching, drilling, flame cutting, beam splitting. *See* www.steelvillage.com. Similarly, the same internet site reveals a varied array of products offered by service centers, but not offered by Loeffel, including: pipe, rod, bar, aluminum, brass, bronze, tubing, carbon, alloy, high speed steels, alloy heat treated, abrasion resistant, high strength, HSLA plate, valves, fitting and flanges. *Id.*

Further dissimilarities abound. Loeffel is a small company with offices in the greater

---

[17] Even where a witness is an expert in the relevant field, the evidentiary reliability demanded by *Daubert* is not present when his or her opinion is speculative or rests on an unsound basis. *See American Bearing Co. v. Litton Industries*, Inc., 540 F.Supp. 1163, 1173 (E.D.Pa. 1982), *aff'd on other grounds*, 729 F.2d 943 (3rd Cir.), *cert. denied* 469 U.S. 854 (1984); *Lithuanian Commerce Corp Ltd. v. Sara Lee Hosiery*, 179 F.R.D. 450 (D.N.J. 1998)(assumptions of a certified public accountant with several advanced degrees).

Chicago area. It employs 70 people, and its customer base is largely in the Midwest. It is in the business of slitting and cutting raw steel into lengths and thicknesses according to customer specifications. Its customers include various industries, from filing cabinet manufacturers to metal building products and stock containers. (*Complaint*, ¶ 1; www.loeffel.com).

A.M. Castle & Co., specializes in the distribution of carbon, alloy and stainless steels; nickel alloys; aluminum; titanium; and brass and copper in a variety of product forms, including bar, plate, tube, sheet and coil. It operates a subsidiary, Total Plastics, Inc., through which it distributes a broad range of value-added industrial plastics. Through another subsidiary, Oliver Steel Plate, it has a market position in alloy and heavy gauge carbon plate products. Along with its affiliated companies, Castle has facilities in over 40 locations throughout North America. Its customer base includes numerous Fortune 500 companies as well as thousands of medium and smaller-sized firms spread across a wide spectrum of industries. (www.amcastle.com).

Friedman Industries, Inc. is in the flat roll sheet and plate steel processing and distribution business. It operates two plants, in Texas and Arkansas, each capable of cutting-to-length, leveling, and temper passing hot roll steel coils. It operates a division selling excess prime, secondary, and transition steel coils, and a division that rolls and welds pipe for use in the water well industry, steel building columns, steel pipe piling, water and air lines, and many structural applications. (www.friedmanindistries.com).

Gibraltar Steel Corp.'s core business is producing value-added, high-margin steel products and services. It has expanded into the metal processing, building products, and commercial heat-treating markets, and is now the second-largest commercial heat-treater in

35

North America and is a major supplier of metal building products. These operations utilize any one or a combination of more than 25 different processes and services to manufacture and deliver a variety of high-quality steel products and services. Gibraltar has expanded its customer base through the acquisition of 22 businesses and the investment of more than $200 million in capital expenditures and now has 72 facilities in 26 states, Mexico, and Canada serving more than 10,000 customers in a variety of industries. These customers are both domestic and international, including manufacturers and distributors and, to a lesser extent, end-users for a wide range of applications, and consumers through hardware and building products distributors and mass merchandisers. Gibraltar's major commercial markets include the automotive, automotive supply, building and construction, steel, machinery, and general manufacturing industries. (www.gibraltar1.complaint).

Olympic Steel is a domestic steel service center with a primary focus on the direct sale and distribution of large volumes of processed carbon, coated and stainless flat-rolled sheet, coil and plate steel products. Its processing services include both traditional service center processes of cutting-to-length, slitting, and shearing and higher value-added processes of blanking, tempering, plate burning, laser welding, and precision machining of steel parts. Olympic operates 12 processing and distribution facilities in Connecticut , Georgia, Illinois, Iowa, Michigan, Minnesota, Ohio, and Pennsylvania, with over 800 employees. It participates in two joint ventures in Michigan that primarily service the automotive market in the Detroit area. Its customers include both regional concerns and larger national and multi-location accounts, located throughout the midwestern, eastern and southern United States.

36

(www.olysteel.com).

Reliance Steel & Aluminum Co., which is traded on the New York Stock Exchange, is one of the largest metals service center companies in the United States. It operates a network of more than 100 locations in 30 states, Belgium, France and South Korea, providing value-added metals processing services. It distributes a full line of more than 90,000 metal products, including galvanized, hot-rolled and cold-finished steel, stainless steel, aluminum, brass, copper, titanium, and alloy steel. Reliance boasts more than 95,000 customers in a broad range of industries. (www.rsac.com).

Ryerson Tull, Inc. is a leading North American distributor and processor of metals with annual sales of over $2.2 billion. With over 5,000 employees, it operates a network of service centers across the United States and Canada, has investments in additional service centers in Mexico and Asia, and maintains metal trading capabilities around the world. Recently, it acquired Integris Metals, Inc., North America's fourth largest metals service center with 2004 revenues of $2 billion. Ryerson Tull processes stainless steel, aluminum, copper alloys, and industrial plastics, and maintains inventories over more than 100,000 metal and plastic items in a wide variety of grades, shapes, and sizes. (www.ryersontull.com).

Steel Technologies, Inc. is one of the largest independent steel processors in North America, and operates a network of 20 facilities throughout the eastern half of the United States and Mexico. It processes precision flatrolled products for various industries, including the automotive, appliance, lawn and garden, agricultural, office equipment and railcar industries. Steel Technologies employs over 1,000 people. (www.steeltechnologies.com).

37

Finally, Worthington Industries, is a global company that processes steel for use in the automotive, construction, hardware, aerospace and many other industries. With some 8,000 employees, Worthington operates 65 facilities in 10 countries across North America and Europe. It manufactures metal products such as metal framing, pressure cylinders, automotive past model service stampings, metal ceiling grid systems and laser welded blanks. Worthington's metal framing subsidiary produces steel studs, floor joists, roof trusses, and other metal accessories for wholesale distributors and commercial and residential building contractors. Its pressure cylinder business caters to customers in the liquified petroleum gas and refrigeration industries, and manufactures cylinders to hold everything from acetylene for welding to oxygen for breathing. (www.worthingtonindustries.com).

*Daubert* requires that trial judges must ensure that any and all expert testimony is not only relevant, but reliable. To that end, a judge must undertake a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts at issue. *Frymire-Brinati*, 2 F.3d at 186. The judge must look behind the expert's ultimate conclusion and analyze the adequacy of its foundation. *Mid-State Fertilizer*, 877 F.2d at 1339. Expert opinion that is speculative is inadmissible. *Cf. Target Market Pub., Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 (7th Cir. 1998).

Mr. Dohmeyer's opinion that the financial performance of the eight companies in the period 1999-2002 can be used in evaluating Loeffel's lost profits or business in that period is unreliable and speculative. The defendants' use the phrase, "junk science," to refer to Mr.

38

Toczyl's expert opinion. It was inappropriate there. *Loeffel Steel Products*, supra. It is, however, appropriately applied to the sampling of supposedly comparable companies compiled by DVC. Mr. Dohmeyer's testimony will not be allowed. The oft-repeated caution that courts should be particularly wary of unfounded expert opinion when causation is the issue applies here. *See In re Agent Orange Product Litigation*, 611 F.Supp. 1223, 1249 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (2nd Cir. 1987), *cert. denied sub nom., Lombardi v. Dow Chemical Co.*, 407 U.S. 1234 (1988); *Thomas v. FAG Bearings*, 846 F.Supp. 1382, 1394 (W.D.Mo. 1994).

## B
## Assessment of Relevance

To be admissible, expert testimony must be not only reliable, but relevant. *Daubert*, 509 U.S. at 597; *United States v. Allen*, 390 F.3d 944, 949 (7th Cir. 2004). Testimony is relevant if it assists the trier of fact in understanding the evidence or in determining a fact at issue. An expert, who, like Mr. Dohmeyer, supplies nothing but a bottom line supplies nothing of value to the judicial process. *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997).

## III
## MR. DOHMEYER'S REPORT CRITIQUING MR. WIERSEMA'S ANALYSIS VIOLATED RULE 26(a)(2)

We come then to the argument that the defendants' failure to comply with the requirements of Rule 26(a)(2)(B), Federal Rules of Civil Procedure, requires barring testimony by Mr. Dohmeyer critical of Mr. Wiersema's conclusions. Recognizing that secrecy is not congenial to truth seeking, the Rule requires that an expert report must disclose "a complete

statement of all opinions to be expressed *and* the basis and reasons therefor . . ."[18] *Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004)(Emphasis supplied).[19]

Mr. Dohmeyer's critique of Mr. Wiersema's report is his one page letter of February 27, 2004. Despite the clarity of Rule 26, and the fact that Mr. Dohmeyer was engaged specifically to analyze Mr. Wiersema's conclusions (Defendants' Response at 2), his report consisted of but five unadorned conclusions, set forth in bullet- point format:

- the Report's model has multiple incorrect premises of damages;

- The Report's model fails to incorporate risk/cost of capital procedures;

- The Report's model adds the alleged lost profits of the equipment as represented and the cost of the machine;

- The Report's model's methodology; and

- The Report's model has [sic] other assumptive and methodological errors.

The letter concludes: "As a result of the foregoing, Mr. Wiersema's model and related opinions are not reliable."

---

[18] Rule 26(a)(2)(B) provides, in pertinent part:

Except as otherwise stipulated or directed by the court, this disclosure *shall*, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report *shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions;* [and] any exhibits to be used as a summary of or support for the opinions;. . . . (Emphasis supplied).

[19] Mr. Wiersema's report referred to approximately 1800 pages of exhibits, detailing expenses Loeffel claims to have incurred as a result of the Line's malfunctioning and the damages from claimed losses of current and prospective customers.

At his deposition, Mr. Dohmeyer conceded that his criticisms of Mr. Wiersema's report offered no explanation, no written opinions, no details, no analysis. (Dohmeyer Dep., at 76, 78). Expertise is a rational process, and a rational process implies express reasons for judgment. *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 627 (1944)(Frankfurter, J. dissenting). An expert's opinion full of assertion but empty of reasons has no value and is devoid of persuasiveness and legal significance.

An expert must demonstrate in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kuhmo Tire*, 526 U.S. at 152. At his deposition, Mr. Dohmeyer spoke of the rigorous standards for admission into the American Society of Appraisers. (Dohmeyer Dep., at 13). He would never have gained admission to the ASA had he submitted an appraisal for evaluation as devoid of explanation and reasoning as was the "preliminary critique" of Mr. Wiersema's report. "[W]hy should a court rely on the sort of exposition [a responsible member of the ASA] would not tolerate in his professional life." *Mid-State Fertilizer Co.*, 877 F.2d at 1339.

What Judge Shadur wrote in *Gregory*, 2002 WL 31972165 at *1, applies equally here: "There is frankly no justification that would permit any 'expert' witness, or any lawyer dealing with one, to tender a report that is so patently deficient in every one of those [things required by Rule 26] as the one that is at issue here." The deficiencies in the February 27th letter – which was never supplemented – are all the more inexcusable in light of Mr. Dohmeyer's involvement in hundreds of cases as an expert and the defendants' lawyers' experience and

skill.[20]

The second aspect of Mr. Dohmeyer's report is the "Analysis of Economic Loss," to which was attached Mr. Dohmeyer's curriculum vitae. It contains the heading, "EXPERT WITNESS TESTIMONY." Rule 26(a)(2)(B) requires the disclosure of "any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years." The report must be "'detailed and complete.'" *Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998)(*quoting* Advisory Committee's note). Thus, the cases have generally defined the "listing of cases"requirement to include the name of the court, the name of the parties, the case number, and whether the testimony was given at deposition or trial. *Id. Accord Zollinger v. Owens-Brockway Glass Container, Inc.*, 233 F.Supp.2d 349, 356 (N.D.N.Y. 2002); *Coleman v. Dydula*, 190 F.R.D. 316, 318 (W.D.N.Y. 1999); *Hilt v. SFC Inc.*, 170 F.R.D. 182, 185 (D.Kan.1997); *Giladi v. Strauch*, No. 94 Civ. 3976, 2001 WL 388052, at *3 (S.D.N.Y. Apr.16, 2001).[21]

In nearly every instance, Mr. Dohmeyer's description of the cases in which he previously had been involved was uninformative. Here are 2 examples: "Breach of Contract – Analysis of Economic Loss to an Oil & Gas Concern," and "Economic Loss – Injury – Jay Gueck, Esq.

---

[20] To emphasize the extent of his experience as an expert witness, Mr. Dohmeyer's Declaration says that he has provided "expert witness testimony and analysis for over 15 years in hundreds of cases." *Id.* at 2.

[21] The Rule requires the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

(August, 2002)." As to the 33 entries that topically were relevant to Mr. Dohmeyer's testimony, involving as they did, "economic loss," the only case name listed was *Ellis v. Walker.* (Qualifications of Principal Appraisers, at 1-6). The others are listed as "Analysis of Economic Loss" or "Economic Loss," followed by the kind of business involved: a restaurant franchise, a weekly newspaper, a mobile home park, an aircraft maintenance facility, medical industry, residential building company, real estate agent, law firm, printing company, software developer, retail dress shop, real estate developer, and so on. As to these entries, their format made impossible, any meaningful investigation of Mr. Dohmeyer's background as an expert witness.[22]

Significantly, Mr. Dohmeyer did not list *In Matter of Dunham*, 110 F.3d 286 (5th Cir. 1997).[23] There, Mr. Dohmeyer was engaged to testify regarding the value of an insurance agency's book of business. He concluded that the value was $26,000; his opposite number in the case, Mr. Phillips, concluded the figure was closer to $200,000. The district court held that Mr. Dohmeyer was not only inexperienced in the insurance industry, but his computations rested on the "erroneous assumption" that no non-competition agreements had been executed. 110 F.3d at 288. The district court did not find Mr. Dohmeyer's assessment credible. The Fifth Circuit agreed that the district court was right in attributing little or no probative value to the

---

[22] Only a handful of the entries contain the designation "trial" or "deposition." Even as to those that did, it was impossible to tell anything about the engagement or Mr. Dohmeyer's testimony since the entry did not contain sufficient information to enable Loeffel to conduct an appropriate inquiry.

[23] The only conceivable reference to the *Dunham* case in the *curriculum vitae* is the terse entry, "Bankruptcy – Valuation of an insurance agency," which was buried in the middle of the 116 entries.

Mr. Dohmeyer's appraisal. *Id.* at 289.

I need not decide why the *curriculum vitae* failed, with but two exceptions, to list the names of the 116 cases. Whatever the reason, given Mr. Dohmeyer's extensive experience and the defendants' lawyer's sophistication, the skeletal format employed was indefensible and severely compromised Loeffel's ability to investigate Mr. Dohmeyer's involvement in any but a handful of the 116 matters he listed.

But this omission is insignificant compared to Mr. Dohmeyer's failure to disclose that the Analysis of Economic Loss was based entirely upon a theory given to him by the defendants, namely that the claimed deficiencies with the Line could be cured by the simple expedient of adding two additional workers and running the Line longer. While the *theory*, itself, might be deducible from the content of the arithmetic schedules that comprise the Analysis of Economic Loss Report, the *source* of the theory was not. Nothing in the "Limiting Conditions," which purported to state the "general assumptions and general limiting conditions" on which the "value opinion report has been prepared," hinted that the core assumptions on which all of Mr. Dohmeyer's endeavors were predicated came from his employers. Indeed, Mr. Dohmeyer's report conveyed precisely the opposite impression.

In the "Appraisal Certification" attached to his report, Mr. Dohmeyer "certif[ied] that, to the best of our knowledge and belief," the "reported analyses, opinions, and conclusions are limited *only* by the *reported assumptions* and limiting conditions, and are *our personal, unbiased professional analyses, opinions, and conclusions.*" He went on to say that "*[n]o one provided significant professional assistance to the person signing this report.*" (Emphasis

44

supplied). This was untrue: the defendants' employees had provided the salient "assumption" on which the Analysis Of Economic Loss was based, and nothing played a more "significant" role in that analysis.

Mr. Dohmeyer attempted at his deposition to distance himself from the "Statement of Limiting Conditions" by claiming that the attachment was "boilerplate that we use in . . . all of our assignments," and that the Appraisal Certification wasn't particularly meaningful since his report was not a business appraisal, but an economic loss analysis. (Dohmeyer deposition at 21, 15-17). In his belatedly filed Declaration, he said that the appraisal certification was attached in error to the Analysis. *Id.* at 2.

Some six months after the deposition, Loeffel filed the instant motion and raised the issue of the non-compliance with Rule 26(a)(2)(B). In response, the defendants filed a nine-page declaration from Mr. Dohmeyer and a paragraph from a book on valuation by Sharron Pratt. The breezy squib cites no authority, either scholarly or legal for its conclusion. Ms. Pratt, according to her internet site, is the owner of Business Valuation Resources, a company dedicated to "high-quality valuation related resources" for all manner of professionals.[24]

The Declaration echoed much of Mr. Dohmeyer's deposition testimony. But it went substantially beyond that and attempted to make the case against Mr. Wiersema that the February 27th "critique" did not. Not surprisingly, Loeffel objects to the Declaration and to the

---

[24] The defendants' Response calls Ms. Pratt a "highly regarded economist," but does not identify the basis for the representation. (Response at 7). An internet search reveals that she writes on valuation of businesses. www.bvresources.com. Ms. Pratt is apparently in the same field as Mr. Dohmeyer.

squib from Ms. Pratt's book.

The Declaration contended that, as a certified public accountant, Mr. Wiersema lacked "valuation expertise" and thus, wrongly concluded that Loeffel's economic loss exceeded the pre-damaged value of the company. (Declaration, ¶ 9). This opinion appeared nowhere in the February 27, 2004 letter. Ms. Pratt apparently agrees, but the one paragraph excerpt relied on by Mr. Dohmeyer, contains no citation of authority and nothing beyond her *ipse dixit* that "[i]t is axiomatic that the present value of lost future profits can be equal to but not greater than, the total value of the enterprise had the damaging event not occurred." However, there immediately follows this sentence, which *supports* Mr. Wiersema's position: "however, I have seen 'experts' testify to damage sums many times any reasonable value for the entire entity." Apparently some judges have admitted as proper expert opinion the conclusion denounced by Mr. Dohmeyer.

He again repeated in his Declaration that there was no authoritative test for assessing damages when a machine operated at a level below specifications. (Declaration,¶ 19). This opinion seems at odds with the defendants' Response, which insists that the measure of damages is properly set forth in *Moorman*. More importantly, Mr. Dohmeyer contradicted his deposition testimony by claiming that the Analysis of Economic Loss relied upon a "benefit of the bargain" theory and took into account the production rates provided by the contract specifications. (Declaration, ¶ 23). To say this contradicts his previous position is an understatement; he testified that the specifications were "inherently not relevant" and that he "didn't consider them one way or another." (Dohmeyer Dep., at 35, 83).

The defendants do not attempt to justify the omissions and deficiencies in the February

27th critique or in Mr. Dohmeyer's curriculum vitae; nor do they attempt to argue that the omissions are harmless. Instead, they say that Mr. Dohmeyer has "satisfie[d] all the requirements of Rule 26," and that Loeffel's only objection relates to the "format" of the February 27th letter. (Response at 17). Any argument of harmlessness is therefore forfeited. *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 869 (7th Cir. 2005); *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004); Rule 37(c)(1), Federal Rules of Civil Procedure. To the extent the Declaration repeats Mr. Dohmeyer's deposition testimony, it is irrelevant. To the extent it seeks to explain the basis for his opinions either in his deposition or in his reports, it is improper and untimely and will not be considered. *Bailey v. Allgas*, 148 F.Supp.2d at 1236. *Cf. Dura Automotive.*

## IV

## CONCLUSION

The plaintiff's motion to bar the testimony of Mr. Dohmeyer [77] is GRANTED, and the plaintiff's motion to strike exhibits A and C to the Response [93] is also GRANTED. The defendants' unamplified request for a "full *Daubert* hearing to determine the admissibility of Mr. Dohmeyer's testimony," made in the last sentence of their Response brief, is denied. I have before me the deposition of Mr. Dohmeyer and his reports. No more is needed to determine reliability. *Kumho Tire*, 526 U.S. at 152; *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 761 n..3 (8th Cir. 2003); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 153-154 (3rd Cir.), *cert. denied* 532 U.S. 921 (2000); *In re Handford Nuclear Reservation Litigation*, 292 F.3d 1124, 1138-39 (9th Cir. 2002); *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir.

1998). They will not be permitted to "return to the drawing board" to restructure Mr. Dohmeyer's testimony. *Gregory*, 2002 WL 31972165 at *3.

**DATE:** July 22, 2005      **ENTERED:** _____

UNITED STATES MAGISTRATE JUDGE