AC

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LOEFFEL STEEL PRODUCTS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 01 C 9389 |
| ) | Magistrate Judge |
| DELTA BRANDS, INC., d/b/a DBI; and ) | Jeffrey Cole |
| SAMUEL F. SAVARIEGO, individually, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## SUPPLEMENTAL MEMORANDUM OPINION AND ORDER

### A

On July 22, 2005, I granted the plaintiff's motion to bar the testimony of DBI's damages expert, Mr. Robert Dohmeyer, but for reasons, in part, other than those raised in Loeffel's motion and supporting memoranda. Consequently, on August 1, 2005, I confirmed by minute order prior in-court conversations with counsel for the parties in which I invited DBI to file a supplemental brief directed to those portions of the opinion that raised new issues.

On August 8, 2005, DBI filed a nine-page Supplemental Submission directed to two issues. The first relates to DBI's quotation from the Illinois Supreme Court's opinion in *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 82, 435 N.E.2d 443, 449 (1982) to support its argument that Mr. Dohmeyer's definition of economic loss was "entirely consistent" with Illinois law's definition. Its reply brief, quoting from *Moorman,* said: Illinois law has defined economic loss as the "damages for inadequate value, costs of repair and replacement of the defective product or consequential loss of profits, without any claim of personal injury or damage to other property." (DBI Reply at 10). The Memorandum Opinion of

June 22, 2005 pointed out that this was an inaccurate quotation and that a whole phrase following the word "property" had been deleted without any indication that there had been a deletion. The Memorandum Opinion questioned whether this was intentional.

DBI's Supplemental Submission contends that the placement of a period at the end of the word "property" without indicating by ellipses – or by some other method – that there was a further part of the sentence was *not* inappropriate "either in a general sense [or] with respect to the specific facts of this case," and that the defendants "had no intention of providing anything other than an absolutely accurate citation...." (Supplemental Submission at 1).

In support of this position, DBI cites four post-*Moorman* Illinois Appellate Court decisions that quoted *Moorman* as did DBI's reply brief. That is, 1) there was no reference to the phrase, "as well as 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold,'" and 2) the deletion of this phrase was not shown by ellipses. The conclusion drawn by DBI is that the "as well as," phrase does not "clearly" reflect *Moorman's* intent to combine both phrases from the two law review articles [cited in *Moorman*] as the single definition of economic loss," but rather merely reflects "*Moorman's* notation of two different ways of describing economic loss – ..." [i.e., that] they are different ways of saying the same thing." *Id.* at 2-3. Consequently, DBI says that no negative inference should have been drawn.

The Illinois Appellate Court decisions give force to the contention. However, the Illinois Supreme Court in post *Moorman* decisions has not quoted *Moorman* in the same truncated way. Thus, in *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 115 Ill.2d 146, 149, 503 N.E.2d 246, 247 (1986), in quoting *Moorman*, the Court used ellipses to signal the exclusion of the "as well as" phrase. This does

2

suggest that the "as well as" phrase is another way of saying the same thing as "damages for inadequate value" or "replacement of a defected product." However, in *In re Illinois Bell Switching Litigation*, 161 Ill.2d 233, 241, 641 N.E.2d 440, 444 (1994), and *2314 Lincoln Park West Condominium Association v. Mann, Gin, Ebel & Frasier, Ltd.*, 136 Ill.2d 302, 307, 555 N.E.2d 346, 348 (1990), the Court quoted *Moorman* exactly as it was written, saying that this is the way the *Moorman* decision defined economic loss. All that was deleted were the two law review citations, which were indicated by "[Citation.]." And in *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill.2d 351, 417, 821 N.E.2d 1099, 1139 (2004), the Court, quoting *Moorman*, noted that the damages sought by the plaintiff were not "the type of economic losses associated with 'disappointed commercial expectations'... "such as 'damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits,' *and* 'the diminution in value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold' [Citation.]. *Moorman*...." (Bracket in original)(Emphasis supplied).[1]

In light of the way in which *Moorman* has been variously quoted and because of my certainty of the good faith of DBI's lawyers, I am persuaded that the manner which the *Moorman* case was cited was not intended to mislead and that no negative inferences should be drawn. Consequently, any contrary suggestion in the July 22nd Memorandum Opinion and Order is withdrawn. But all this does is to underscore the need for accurate quotations. Of course, ellipses are not a cure for misquotation and indeed

---

[1] DBI's Response brief was filed on March 14, 2005, four months after *Beretta* was decided. *But see Congregation of the Passion v. Touche Ross & Co.*, 159 Ill.2d 137, 187, 636 N.E.2d 503, 525 (1994), where the Court neither included the "as well as" phrase in quoting *Moorman*, nor used ellipses to indicate deletions from the original quotation.

3

are often the vehicle for misleading. *See* Posner, Overcoming Law, 277 (1995)("Beware a Horwitz bearing ellipses."). Nonetheless, they at least alert the reader that something has been left out and avoid any possibility of misunderstanding or misperception.[2]

**B**

The second point raised in the Supplemental Submission relates to the conclusion that Mr. Dohmeyer's "expert" testimony cannot simply parrot what he was told by DBI's employees, and since they were not designated as experts, and cannot therefore testify about their "expert" theories, he cannot testify based on what they told him. DBI has suggested that I should "await the testimony of the underlying witnesses on the facts to which they are entitled to testify before making a ruling on the admissibility of Mr. Dohmeyer's testimony." (Supplemental Submission at 9; Reply Submission at 4). In DBI's view "it is fair to view the information to be provided to Mr. Dohmeyer by the Delta employees as very similar to the information provided by Plaintiff's employees to Mr. Toczyl in attempting to support his opinions on liability. Both blocks of information depended on the knowledge of steel processing on this machine and information that the testifying expert either could not or did not verify independently as to the entire block of information." (Reply Submission at 2).

I do not think that this conclusion bears careful scrutiny. Quoting the same paragraph from *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002) that was quoted in the June 22nd Memorandum Opinion, DBI quite properly notes that an expert witness is permitted to use

---

[2] Where language is omitted from the end of a quoted sentence, the deletions should be indicated by an ellipses. *See* The Bluebook, A Uniform System of Citation, 46 (The Harvard Law Review Association, Seventeenth Edition 2000); The Chicago Manual of Style: The Essential Guide for Writers, Editors and Publishers, 458 (The University of Chicago Press, Fifteenth Edition 2003).

4

"assistants" in formulating an expert opinion. To be sure that the assistants "perform their tasks competently," they can be deposed. The expert witness can be asked at his deposition whether he supervised them carefully and whether "his relying on their assistance was standard practice in his field." *Id.* at 613. The quoted paragraph can only be properly understood by considering the paragraph immediately following it. That paragraph begins: "Analysis becomes more complicated if the assistants aren't merely gofers or data gatherers but exercise professional judgment that is beyond the expert's ken." *Id.* at 612.

The Loeffel employees who assisted Mr. Toczyl really *were* mere "data gatherers." They reported Line speeds and took measurements. They performed no independent analysis and provided no expertise beyond the ken of Mr. Toczyl, who participated in what they did. By contrast – and the contrast could scarcely be more stark – the DBI employees did not assist Mr. Dohmeyer in any way. Rather, they provided him with the very theory on which he relied and which admittedly was "beyond [his] ken." 285 F.3d at 612. In short, *they* were the experts, not he, and he was unable "to testify to the veracity of" their conclusions. *St. Paul Fire & Marine Insurance Co. v. Noelen Group, Inc.*, 2005 WL 1168380 at *9 (E.D.Pa. 2005).[3]

Of course, it is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert, and Rule 703 contains no general requirement that the other expert testify as well, unless of course the soundness of the

---

[3] In *St. Paul Fire & Marine*, the court made clear that the non-testifying individual on whose work the expert was basing his opinions did not develop an original statistical model. He simply did calculations that could have been done by a computer. The evidence was clear that the expert's reliance on the work of the statistician was of the type normally relied on by experts in the field. In the instant case there is no such evidence.

5

underlying expert judgment is in issue. *Dura Automotive*, 285 F.3d at 613. "This does not mean, however, that an expert is allowed to be simply a 'mouthpiece' for a scientist from another field." *Builders Ass'n of Greater Chicago v. City of Chicago*, 2003 WL 1786489 at *6 (N.D.Ill. 2003)(Moran, J.).

Judge Posner, in *Dura Automotive*, gave the example of the thoracic surgeon attempting to give expert evidence in a medical malpractice case that the plaintiff's decedent had died because the defendant radiologist should have discovered the cancer sooner. In that case, Rule 703 would not allow the testimony, because the surgeon would be merely parroting the opinion of an expert in radiology, and the surgeon was not competent to testify that the defendant had x-rayed the decedent carelessly. "The case would be governed [then], Judge Posner said, by . . . *In re James Wilson Associates*, 965 F.2d 160, 172-73 (7th Cir. 1992). . . ." 285 F.3d at 613. *Dura Automotive* also cited at this point *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993). Both these opinions were also discussed in the June 22nd Memorandum Opinion and Order.

It is difficult to see a principled difference between the instant case and the thoracic surgeon hypothesized in *Dura Automotive*. Mr. Dohmeyer is infinitely less competent to formulate an opinion based on what is, in effect, expert testimony in a technical field, so vastly dissimilar from his own, than was the hypothetical thoracic surgeon in *Dura Automotive*. At least the surgeon presumably had some knowledge of radiology (although not enough). Here, Mr. Dohmeyer has conceded that he does not have a clue about the merits and validity of the theory provided him by DBI.

Where the witness and the individual on whom the expert's opinion is in part based, are "experts in the same field," *Builders Ass'n of Greater Chicago v. City of Chicago*, 2003 WL 1786489 at *6 (N.D.Ill. 2003)(Moran, J.), the concerns underlying *Dura Automotive* and *In re James Wilson*

*Associates* are absent (or at least minimized to an acceptable degree).

Rule 26(a)(2)(A), Federal Rules of Civil Procedure, references the Federal Rules of Evidence to determine what must be disclosed as expert testimony. Expert testimony is designated as such by its reliance on "scientific, technical, or other specialized knowledge." *See Musser v. Gentiva Health Services*, 356 F.3d 751, 757 n.2 (7th Cir. 2004). However, DBI's employees have not been designated as experts, even though the information on which Mr. Dohmeyer relied required technical or other specialized knowledge.

Thus, I am unable to agree that the kind of information provided Mr. Dohmeyer is "essentially a factual description of the capabilities and operation of the machine." (Supplemental Submission at 8, n.1). It is rather, DBI's employees' opinion that additional workers, working more hours will in fact cure the Line's deficiencies and productivity problems and their assessment of how many are required and how much time they would have to spend to achieve the same rate of productivity as if the Line had performed in accordance with its specifications. It is anything but a mechanistic extrapolation from the Line's stated specifications. For example, saying that it takes only a matter of minutes to manually level a 60,000 lb. coil of steel is not a "factual description of the capabilities and operation of the machine." It is, to use DBI's phrasing, a "'judgment call' opinion." *Id.*

So too is the DBI employees' opinion of the number of operators required to operate the equipment and the number of coils that can be run through the Line in an eight-hour shift. (Supplemental Submission at 9, ¶¶ 2, 4). That is a function of a substantial number of variables, and depends upon the Line's deficiencies and problems. The question is not how many operators are required to operate the equipment in the abstract, but how many are needed under the circumstances presented by this case, and

7

whether the addition of additional workers and shifts will really achieve the output and productivity promised in the specifications for a properly running machine. That is clearly not a simple matter of reviewing specifications as set forth in the sales contract and making mathematical computations. *That would "be doing accounting," Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000), which the Memorandum Opinion and Order acknowledged Mr. Dohmeyer *was* capable of doing.

Had it been quite the simple matter the Supplemental Submission suggests, all Mr. Dohmeyer would have done is review the specifications in the sales contract and made his computations.[4] But that is not what Mr. Dohmeyer did, as he admitted. Indeed, he admitted he never reviewed the specifications, which he found to be irrelevant to his determination of economic loss. (Dohmeyer Deposition at 35).

The Supplemental Submission argues that the information upon which Mr. Dohmeyer relied is "tilted far more heavily toward the material that was allowed in *Tuf Racing* than was disallowed in *Dura Automotive*." The salient flaw in this contention is the unarticulated assumption that the issues with which the court dealt in the two cases were comparable and that *Tuf Racing* "allowed" the expert to testify without regard to the independent admissibility of the underlying data. In fact, the cases are not remotely comparable, and the issue in this case was not before the court in *Tuf Racing*.

In *Tuf Racing*, a certified public accountant calculated the discounted present value of the lost future earnings that Tuf would have had had it not been terminated. This calculation, which the court said was "well within the competence of a C.P.A.," was based on financial information furnished by Tuf and

---

[4] If that is all that was needed, DBI's own employees could have done it.

assumptions given to him by counsel of the effect of the termination on Tuf's sales. 223 F.3d at 591; Supplemental Submission at 8. Properly read, all *Tuf Racing* held was that a certified public accountant need not have a degree in economics, statistics, mathematics, or some other academic field that might bear on the calculation of damages. The court rejected as "radically unsound" the notion that *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) requires particular credentials. 223 F.3d at 591.

The opinion did not suggest that the C.P.A.'s testimony was admissible without regard to the independent admissibility of the financial information furnished by the plaintiff and the assumptions given to him by counsel. Nor could it have in light of In re James Wilson Associates, which, like *Tuf Racing*, was authored by Judge Posner and which preceded *Tuf Racing* by eight years.[5] Given the dissimilarities of the issues in the two cases, it is not surprising that *Tuf Racing* did not cite *In re James Wilson Associates*, even though the author of both opinions was the same. For the same reason, it is not surprising that Judge Posner's 2002 opinion in *Dura Automotive* did not cite his 2000 opinion in *Tuf Racing*. In short, the issue presented in this case was not considered in *Tuf Racing*, and that case is irrelevant, for prior cases have precedential value only when there has been a deliberative consideration of the issue at hand. *Sub-silentio* resolution is not enough.[6]

---

[5] *Tuf* was announced on July 24, 2000; *In re James Wilson Associates* was announced on May 22, 1992.

[6] *See City of Kenosha v. Bruno*, 412 U.S. 507, 512-13 (1973)("But in none of the three opinions in Holmes was the issue of whether or not a municipality is a person within the meaning of §1983 discussed."); *Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1090 (3d Cir. 1976) ("The challenge raised in this appeal was not presented to the court in those cases. Thus, it cannot be said that we have considered, adjudicated and set forth a holding regarding the duality problem."); *United States v. Bohle*, 445 F.2d 54, 65 (7th Cir. 1971)("However, there was apparently no challenge to the admission of this evidence...We think it clear that Becker was not intended to, and did not, resolve the question of the
(continued...)

In conclusion, I am not persuaded that Mr. Dohmeyer should be allowed to testify to an opinion that was based on a theory furnished him by the defendant's employees in the midst of litigation without regard to the independent admissibility of the information. *In re James Wilson Associates, Dura Automotive* and *In re Estate of Barbouti* simply will not permit Mr. Dohmeyer to be the mouthpiece for DBI's employees. DBI has made no attempt to demonstrate that the kind of information on which Mr. Dohmeyer slavishly relied was of the type normally relied on by experts in his field.

### C.

Nor am I persuaded that Mr. Dohmeyer's definition of economic loss *is* "entirely consistent" with *Moorman* and Illinois law. Of course, it is possible that Mr. Dohmeyer may have thought his methodology and definition unique, when in fact they were not, notwithstanding his claims to primacy of authorship. (Supplemental Submission at 9; Reply Supplemental Submission at 3). But that disconnect, if it existed, would be a matter for trial, not a basis for barring his testimony. The conclusion that Mr. Dohmeyer's definition of economic loss differed from *Moorman's* was based, as the Memorandum Opinion and Order makes clear, on the hypotheticals Mr. Dohmeyer gave to illustrate his view about the appropriate measure of damages in a case involving faulty equipment.

Those hypotheticals showed that this conclusion was not limited to the particular circumstances of this case. Quite the contrary; his testimony demonstrated the incompatibility of his general concept of economic loss with that of the Illinois Supreme Court in *Moorman*. That incompatibility is apparent in the portions of the deposition quoted in the Memorandum Opinion and Order – to which DBI's Supplemental

---

[6](...continued)
admissibility of records of mental diagnoses. Thus, we must approach it as an issue of first impression in this court.").

10

Submission does not respond – and in the following exchange:

> Q: Right. But couldn't I also take the position in your analogy that, hey, I paid you a million two hundred fifty thousand in the purchase price and a million five and the line I got isn't worth $100,000.
>
> A. No, because you'd be double-counting... you can't have – you can't say, I want my money back and I want all the lost profits on the machine that I – the machine would have produced for me had it worked the way it should have worked. You can't do that. I mean, that's –
>
> Q. No, I'm using your analogy, what I think is your – you're taking the position that, in your analogy that you just gave, that if the guy says, I bought something for $10, you get a hold-back of a buck; got – paid the guy nine, and it doesn't do something; and I say, you owe me two bucks for the damages, I don't – I don't think that – *I don't see there's any problem saying, you owe me two bucks for damages, and by the way, your actual market value of the machine is less than $9.00.*
>
> A. *You really don't?*
>
> Q. I really don't.
>
> A. Because that's –
>
> Q. *You can have lost profits for sales you can't get because the machine doesn't work correctly, and you can also say the value of the machine is something entirely different.*
>
> A. *No, that's – that's absolutely double-counting.* And I – you seem very – very – you seem like a very intelligent person to me, and I'm shocked that you would say that. *Because you can't have both.*

(Dohmeyer Deposition. at 133-34)(Emphasis supplied).

In short, under Illinois law, both lost profits and diminished value are economic losses and are recoverable – and DBI does not argue to the contrary. Under Mr. Dohmeyer's concept of economic loss, they are not.

11

## CONCLUSION

While the excellent Supplemental Submission and Reply Supplemental Submission ably articulate DBI's position, I do not think that the Memorandum Opinion and Order of June 22, 2005 should be amended beyond the issue of the *Moorman* quotation. A final comment, however, is warranted, even though not raised by the Supplemental Submissions. The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless. *Musser*, 365 F.3d at 758. I am unable, on the record presently before me to make any determination on this score, and the defendants have not raised the issue. Leaving aside for now the question of possible waiver, there is perhaps a theoretical possibility that notwithstanding the failure to designate the DBI employees as experts – of course they may testify as fact witnesses if appropriate, *Musser*, 356 F.3d at 757 – it may be that their testimony could nonetheless be properly admitted. But that determination need not and cannot be made now. And so for now, the Memorandum Opinion and Order of June 22, 2005 remains in force as to Mr. Dohmeyer.

DATE: September 8, 2005  ENTERED: _____
UNITED STATES MAGISTRATE JUDGE